# Syllabus

Chief Justice:        Justices:
Robert P. Young, Jr.   Michael F. Cavanagh
                       Stephen J. Markman
                       Mary Beth Kelly
                       Brian K. Zahra
                       Bridget M. McCormack
                       David F. Viviano

Reporter of Decisions:
Corbin R. Davis

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

*In re* MORROW

Docket No. 146802. Argued March 5, 2014 (Calendar No. 1). Decided June 23, 2014.

The Judicial Tenure Commission (JTC) filed a formal complaint against Wayne Circuit Court Judge Bruce U. Morrow, alleging 10 counts of judicial misconduct that arose out of criminal cases over which he had presided. Before the formal complaint was filed, respondent and the examiner had entered into a settlement agreement in which respondent would have been publicly censured for his conduct in four criminal cases. The JTC agreed that the stipulated facts established judicial misconduct and recommended that the Supreme Court impose the agreed-upon public censure; however, the Supreme Court rejected the proposed public censure as too lenient in light of the facts presented and remanded for further proceedings. 493 Mich 878 (2012). After the parties were unable to reach a new settlement agreement, the Supreme Court entered a confidential order stating that a 90-day suspension was an appropriate order of discipline and that such a sanction would enter unless respondent objected by withdrawing his consent to be disciplined. Respondent then withdrew his consent, and the JTC filed the formal complaint at issue. The alleged misconduct included improperly closing the courtroom during a hearing and ordering the court reporter not to prepare a transcript; failing to sentence defendants in accordance with the law; refusing to remand a defendant convicted of sexually assaulting a minor to jail as required by MCL 770.9b(1); improperly dismissing cases sua sponte; failing to place a sidebar conference on the record, rule on the defendant's request for a curative instruction, and follow instructions from the Court of Appeals to hold an evidentiary hearing on a contested legal issue, then issuing a ruling on remand that was not supported by the trial record; leaving the bench at the beginning of a trial to shake hands with the defendant and give a package of documents to defense counsel; subpoenaing a defendant's medical records sua sponte without the parties' knowledge or consent; and personally retrieving an inmate from lockup, escorting him to the courtroom, and sentencing him without restraints or security personnel present. The appointed master, retired Oakland Circuit Court Judge Edward Sosnik, found that a preponderance of the evidence established the factual basis for each of the allegations in the formal complaint, but concluded that the facts constituted judicial misconduct in two counts only. After hearing argument on objections to the master's report, a majority of the JTC concluded that the evidence established judicial misconduct in eight of the ten allegations and recommended that respondent be suspended for 90 days without pay under the standards set forth in *In re Brown*, 461 Mich 1291 (2000).

In an opinion per curiam signed by Justices MARKMAN, KELLY, ZAHRA, MCCORMACK, and VIVIANO, the Supreme Court *held*:

The record established that respondent committed the acts of judicial misconduct as set forth by the JTC majority, and the JTC's conclusions of law were formally adopted. However, a downward deviation from the JTC's recommended sanction of a 90-day suspension without pay was warranted in light of the fact that respondent did not seek to personally benefit from his misconduct and that much of the misconduct was too unrelated to constitute a meaningful pattern.

1. Respondent failed to adhere to the high standards of professional conduct that the Michigan Constitution, court rules, and canons of judicial conduct require of judicial officers. The totality of the evidence painted a portrait of a judicial officer who was unable to separate the authority of the judicial office he held from his personal convictions. Respondent's closing of his courtroom without complying with the governing court rule impeded the proper administration of justice. His refusal to follow mandatory statutory language after it was brought to his attention evinced a willful failure to observe the law, which eroded the public's confidence in a fair and impartial judiciary, as did his disregard of a superior court order directing him to hold a hearing. His recasting of a previous order dismissing a case without prejudice to justify his sua sponte dismissal of the case after it was reissued, despite the defendant's intention to plead guilty, degraded the integrity of the judicial process and the judiciary itself. Respondent failed to recognize the limits of his adjudicative role when he subpoenaed a defendant's medical records without the parties' knowledge or consent at a point when the case could have gone to trial with him possibly as the trier of fact. Respondent recklessly placed himself and others in his courtroom at risk of serious harm by personally bringing a defendant convicted of several violent crimes from lockup and sentencing him without restraints or courtroom security present. Finally, respondent showed poor judgment by coming down from the bench at the start of a trial to shake hands with a criminal defendant and deliver papers to his counsel, which, at a minimum, created the appearance of impropriety.

2. A downward deviation from the JTC's recommended sanction of a 90-day suspension without pay was warranted. This Court's overriding duty in the area of judicial discipline proceedings is to treat equivalent cases in an equivalent manner and unequivalent cases in a proportionate manner. The fact that respondent did not seek to personally benefit from his misconduct was a relevant mitigating factor. Further, while some of the counts showed a pattern of willful disregard of controlling legal authority, the remaining counts of misconduct shared nothing in common except for the fact that they constituted judicial misconduct, and were too unrelated to constitute a meaningful pattern for purposes of the first *Brown* factor, which states that misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct. While many of respondent's acts of misconduct, taken alone, would probably have warranted no more than a public censure and the more serious instances of misconduct, taken alone, would likely have merited a short suspension, when the allegations were aggregated and the body of misconduct was considered as a whole, a greater sanction was necessary to protect the integrity of the judiciary as an institution. When a judge commits a series of legal errors for which there can be no colorable good-faith excuse, a 60-day suspension is a sufficiently severe sanction to protect the integrity of the judiciary while also maintaining fidelity to the principle that equivalent conduct be treated equivalently.

Sixty-day suspension imposed.

Chief Justice YOUNG, concurring in part and dissenting in part, would have imposed the 90-day suspension recommended by the JTC because it most appropriately addressed the extent of respondent's documented misconduct, considering that the misconduct occurred in respondent's official capacity as a judge, it affected the administration of justice, and was part of a pattern. He would have held that when the record reflects that a judge has demonstrated a pattern of lawlessness in the discharge of his or her judicial duties that did not involve mere mistakes in applying the law, the sanction should presumptively be no less than a 90-day suspension without pay. He joined the majority's demand that the JTC undertake the task to create standards by which to assess judicial discipline in a manner that is consistent with the rule of law.

Justice CAVANAGH, dissenting, would have concluded that public censure was an appropriate sanction for respondent's misconduct in light of the JTC's findings, conclusions, and initial recommendation; the settlement agreement between respondent and the JTC, the standards set forth in *Brown*; and the deference generally afforded to the JTC's recommendations.

©2014 State of Michigan

# Opinion

Chief Justice:          Justices:
Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED June 23, 2014

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable BRUCE U. MORROW,           No. 146802
Judge, 3rd Circuit Court

BEFORE THE ENTIRE BENCH

PER CURIAM.

This case comes to the Court on the recommendation of the Judicial Tenure Commission (JTC) that Judge Bruce U. Morrow (respondent) be suspended from office for 90 days without pay. Respondent has filed a petition requesting that this Court reject or modify that recommendation. After review of the entire record and due consideration of the parties' arguments, we agree with the JTC's conclusion that respondent committed judicial misconduct, but we are not persuaded that the recommended sanction is appropriate in this case. Instead, we hold that a 60-day suspension without pay is proportionate to the body of judicial misconduct established by the record.

## I. FACTS

Respondent is a judge on the 3rd Circuit Court in Wayne County, Michigan. He is therefore subject to all the duties and responsibilities imposed on him by the canons of judicial conduct and the standards for discipline set forth in MCR 9.104 and MCR 9.205.

Before the formal complaint was filed in this case, respondent and the examiner entered into a settlement agreement whereby the parties stipulated to a set of facts involving respondent's conduct in four criminal cases in which respondent was the presiding judge. As part of the agreement, respondent consented to be publicly censured. The JTC agreed that the stipulated facts established judicial misconduct and, over a two-member dissent, recommended that this Court impose the agreed-upon public censure. The dissenting JTC members would have recommended a 60- to 90-day suspension. This Court rejected the proposed public censure as too lenient in light of the facts presented and remanded for further proceedings while retaining jurisdiction.[1] Thereafter, the JTC reported that the parties were unable to reach a new settlement agreement. In response, this Court entered a confidential order stating that a 90-day suspension was an appropriate order of discipline and that such a sanction would enter unless respondent objected by withdrawing his consent to be disciplined.

Respondent withdrew his consent, and on March 7, 2013, the JTC filed Formal Complaint No. 92 against respondent. The complaint alleges 10 counts of judicial misconduct, all arising out of criminal cases in which respondent was the presiding judge. The facts of each count can be summarized as follows:

---

[1] *In re Morrow*, 493 Mich 878 (2012).

2

Count 1: In *People v Orlewicz*, Case No. 07-23972, respondent closed the courtroom to the public and the victim's family during a postconviction hearing without specifically stating the reasons for the closure or entering a written order as required by MCR 8.116(D). Respondent subsequently ordered his court reporter not to prepare transcripts of the hearing.

Count 2: In *People v Fletcher*, Case No. 08-10018, respondent failed to sentence a defendant convicted of operating a motor vehicle while intoxicated, third offense, MCL 257.625, in accordance with the mandatory minimum of 30 days in jail as prescribed by MCL 257.625(9)(c)(*ii*), despite the prosecutor's bringing the relevant statute to his attention. Respondent later discharged the defendant from probation without the defendant's having served the mandatory 30 days in jail.

Count 3: In *People v Slone*, Case No. 09-29628, respondent sentenced the defendant to a prison term 18 months below the sentencing guidelines range.

Count 4: In *People v McGee*, Case No. 05-8641, respondent refused the prosecutor's request to remand the defendant convicted of first-degree criminal sexual conduct with a person under the age of 13 to jail awaiting sentencing as required by MCL 770.9b(1).

Count 5: In *People v Wilder*, Case No. 09-3577, following the defendant's guilty plea, respondent dismissed the case *sua sponte* on the basis that a previous dismissal order was with prejudice. When the prosecutor informed him that his justification was contradicted by the record—in fact, the prior dismissal was without prejudice—respondent stated that the dismissal was "conditional with prejudice."

Count 6: In *People v Jones*, Case No. 08-13361, respondent *sua sponte* dismissed the case on the basis of unreliable information in a search warrant affidavit after directing the prosecution to produce all its search

warrant records involving a particular confidential informant and was subsequently disqualified from the case by the Court of Appeals.

Count 7: In *People v Boismier*, Case No. 08-12562, respondent failed to place a sidebar conference on the record, failed to rule on the defendant's request for a curative instruction, and failed to follow instructions from the Court of Appeals to hold an evidentiary hearing on a contested legal issue, and his ruling on remand was not supported by the trial record.

Count 8: In *People v Redding*, Case No. 07-3989, at the beginning of a trial over which he was to preside, respondent left the bench, shook hands with the defendant, and gave a package of documents to defense counsel.

Count 9: In *People v Moore*, Case No. 06-3221, respondent *sua sponte* subpoenaed medical records of the defendant without the parties' knowledge or consent.

Count 10: In *People v Hill*, Case No. 09-18342-02, respondent personally retrieved an inmate from lockup, escorted him to his courtroom, and sentenced him without restraints or courtroom security personnel present.

On March 15, 2013, this Court appointed the Honorable Edward Sosnik as master. In his report, the master found that a preponderance of the evidence established the factual basis for each of the allegations in the formal complaint. However, the master concluded that the facts constituted judicial misconduct in only two counts—Count 4 and Count 10.[2] After hearing argument on objections to the master's report, the JTC issued

---

[2] According to the master, "[T]here is a pattern in . . . these cases, but not necessarily as described by the Examiner. Respondent's 'pattern' of judging is to proactively prevent legally wrongful results. Though his methods are sometimes unorthodox, 'his heart is in

4

its decision and recommendation on December 9, 2013. A majority of the JTC disagreed in large part with the master's conclusions of law, concluding that the evidence established judicial misconduct in eight of the ten allegations.[3] On the basis of the disciplinary factors established in *In re Brown*,[4] the JTC recommended that respondent be suspended for 90 days without pay.[5]

## II. ANALYSIS

## A. STANDARD OF REVIEW

Judicial tenure cases come to this Court on recommendation of the JTC, but the authority to discipline judicial officers rests solely in the Michigan Supreme Court.[6] Accordingly, we review de novo the JTC's findings of fact, conclusions of law, and recommendation for discipline.[7] The examiner has the burden to prove allegations of judicial misconduct by a preponderance of the evidence.[8]

---

the right place' ensuring in his mind, that justice prevails in the criminal justice system."

[3] The JTC made no mention of two of the alleged instances of misconduct, Counts 3 and 6, evidently agreeing that these counts did not establish judicial misconduct. Our review of the record in those cases leads us to the same conclusion. Accordingly, we need not address these allegations further.

[4] *In re Brown*, 461 Mich 1291 (2000).

[5] One JTC member, 3rd Circuit Court Judge Michael Hathaway, concurred in part and dissented in part. He would have concluded that respondent's handling of the *Orlewicz*, *Wilder*, and *Boismier* cases (Counts 1, 5, and 7) did not constitute judicial misconduct. However, he concurred in the recommendation for a 90-day suspension.

[6] Const 1963, art 6, § 30.

[7] *In re James*, 492 Mich 553, 560; 821 NW2d 144 (2012).

[8] MCR 9.211(A).

5

## B. FACTUAL FINDINGS AND CONCLUSIONS OF LAW

After careful review of the factual record in this case, we agree with the master and the JTC that a preponderance of the evidence establishes the factual basis of the allegations in the formal complaint. We further agree that the record establishes that respondent committed the acts of judicial misconduct as set forth by the JTC majority, and we formally adopt its conclusions of law.[9] In our view, the totality of the evidence in this case paints a portrait of a judicial officer who was unable to "separate the authority of the judicial office he holds from his personal convictions[.]"[10]

In *Orlewicz*, respondent's perfunctory ruling closing the courtroom to the public and the victim's family without complying with the governing court rule impeded the proper administration of justice. And, in *Fletcher* and *McGee*, respondent's refusal to follow mandatory statutory language after the controlling authority was brought to his attention evinced a willful failure to observe the law, eroding the public's confidence in a fair and impartial judiciary. Similarly corrosive of the public's faith in our judicial

---

[9] In particular, we agree with the JTC that respondent committed the following acts in violation of the corresponding canons and court rules governing judicial conduct: misconduct in office, Const 1963, art 6, § 30(2) and MCR 9.205; conduct prejudicial to the administration of justice, Const 1963, art 6, § 30(2), MCR 9.205(B), and MCR 9.104(1); failure to establish, maintain, enforce, and personally observe high standards of conduct "so that the integrity and independence of the judiciary may be preserved," Canon 1; irresponsible or improper conduct that erodes public confidence in the judiciary, Canon 2A; conduct involving impropriety and the appearance of impropriety, Canon 2A; failure to respect and observe the law, Canon 2B; failure to conduct oneself in a manner that promotes public confidence in the integrity and impartiality of the judiciary, Canon 2B; failure to be faithful to the law, Canon 3A(1); and conduct that exposes the legal profession and the courts to obloquy, contempt, censure, or reproach, MCR 9.104(2).

[10] *In re Hague*, 412 Mich 532, 562; 315 NW2d 524 (1982).

system was respondent's disregard of a superior court order directing him to hold a hearing in *Boismier*.

In *Wilder*, respondent's recasting of a previous order dismissing a case without prejudice to somehow justify his *sua sponte* dismissal of the case after it was reissued, despite the defendant's intention to plead guilty, degraded the integrity of the judicial process and the judiciary itself.

In *Moore*, respondent failed to recognize the limits of his adjudicative role when he subpoenaed the defendant's medical records without the parties' knowledge or consent at a point when the case could have gone to trial with him possibly as the trier of fact.

In *Hill*, respondent recklessly placed himself and others in his courtroom at risk of serious harm by personally bringing a defendant convicted of several violent crimes from lockup and sentencing him without restraints or courtroom security present.

Finally, in *Redding*, respondent showed poor judgment by coming down from the bench at the start of trial to shake hands with a criminal defendant and deliver papers to his counsel. At a minimum, respondent's unexplained delivery of documents and peculiar greeting of a litigant under these circumstances created the appearance of impropriety.

In sum, we agree with the JTC that respondent failed to adhere to the high standards of professional conduct that our Constitution, court rules, and canons of judicial conduct require of judicial officers.

7

Respondent claims his conduct should be immune from action by the JTC because he acted "in good faith and with due diligence[.]"[11] Respondent misapprehends the meaning of "good faith." Acting in disregard of the law and the established limits of the judicial role to pursue a perceived notion of the higher good, as respondent did in this case, is not "good faith."[12] We do not share respondent's concern that our decision today spells the end of judicial independence. Rather, it reinforces the principle that, although judicial officers should strive to do justice, they must do so *under the law* and within the confines of their adjudicative role.

## C. PROPORTIONALITY OF RECOMMENDED SANCTION

The JTC recommends that this Court suspend respondent for 90 days without pay. The JTC arrived at this recommendation after finding that six of the seven *Brown* factors militated in favor of a more serious sanction.[13] According to the JTC, the evidence

---

[11] MCR 9.203(B).

[12] See *Hague*, 412 Mich at 552-554 (concluding that the respondent's willful disregard of gun-control and prostitution laws was properly subject to sanctions by the JTC).

[13] The seven factors, as set forth in *Brown*, are:

> (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;

> (2) misconduct on the bench is usually more serious than the same misconduct off the bench;

> (3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;

8

revealed "a pattern of willfully disregarding the law and proper legal procedures in the handling of cases." Not only did the conduct occur on the bench, but "[m]uch of Respondent's misconduct was prejudicial to the actual administration of justice." When his conduct did not implicate the actual administration of justice, respondent at least created the appearance of impropriety. The JTC further determined that respondent's conduct was deliberate, rather than spontaneous, and that "[a] judge [who] fails to follow the law necessarily undermines the ability of the justice system to reach just results." However, the JTC concluded that none of respondent's conduct involved the unequal application of justice.

This Court gives considerable deference to the JTC's recommendations for sanctions, but our deference is not "a matter of blind faith[.]"[14] Instead, it "is a function of the JTC adequately articulating the bases for its findings and demonstrating that there

> (4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;
>
> (5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;
>
> (6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;
>
> (7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. [*Brown*, 461 Mich at 1292-1293.]

[14] *Id*. at 1292.

9

is a reasonable relationship between such findings and the recommended discipline."[15] Several considerations in this case persuade us to deviate downward from the JTC's recommended sanction.

This Court's overriding duty in the area of judicial discipline proceedings is to treat "equivalent cases in an equivalent manner and . . . unequivalent cases in a proportionate manner."[16] This duty necessarily requires this Court to make qualitative assessments of the nature of the misconduct at issue. In an attempt to fulfill our duty to treat JTC respondents equitably while maintaining predictability and consistency in our judicial discipline decisions, this Court articulated a set of disciplinary factors in *In re Brown*.[17] But the *Brown* factors are intentionally nonexhaustive.[18] Thus, other relevant considerations not expressly accounted for by the *Brown* factors may properly inform the disciplinary analysis.[19] One principle that has guided this Court's disciplinary analysis, but which is not expressly accounted for by the *Brown* factors, is the principle that dishonest or selfish conduct warrants greater discipline than conduct lacking such characteristics. Generally speaking, we have imposed greater discipline for conduct

---

[15] *Id*.

[16] *Id*.

[17] *Id*. at 1292-1293.

[18] See *id*. at 1293 ("The JTC should consider these *and other appropriate standards* that it may develop in its expertise, when it offers its recommendations.") (emphasis added).

[19] Despite our exhortation in *Brown*, the JTC has not formally adopted additional standards for determining the appropriate sanction for particular misconduct. We take this opportunity to again encourage the JTC to develop such standards so they may be applied in future judicial discipline proceedings.

involving exploitation of judicial office for personal gain.[20]  This principle has also been

long recognized in the related area of attorney discipline proceedings.[21]

As established above, respondent's actions in the eight cases constitutes judicial

misconduct subject to discipline by this Court, regardless of whether, as the master put it,

"his heart [was] in the right place."  However, the fact that he did not seek to personally

benefit from his misconduct is a relevant mitigating factor in determining the appropriate

discipline.[22]  In this respect, this case contrasts with two cases involving 90-day

[20] See, e.g., *In re McCree*, 495 Mich 51; 845 NW2d 458 (2014) (the respondent judge used his position to violate court security policies and engage in numerous ex parte communications with the complaining witness in a case before him in order to pursue a sexual relationship with her); *In re James*, 492 Mich 553; 821 NW2d 144 (2012) (the respondent judge misappropriated funds for her personal benefit); *In re Justin*, 490 Mich 394; 809 NW2d 126 (2012) (the respondent judge "fixed" traffic tickets for himself, his wife, and his staff).

[21] American Bar Association Standards for Imposing Lawyer Sanctions (ABA Standards), Standard 9.22(b), available at <http://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/corrected_standards_sanctions_may2012_wfootnotes.authcheckdam.pdf > [http://perma.cc/P9WG-U39T], accessed June 16, 2014 (listing "dishonest or selfish motive" as an aggravating factor in deciding the appropriate sanction to impose).

[22] See, e.g., ABA Standard 9.32(b) (listing "absence of a dishonest or selfish motive" as a mitigating factor in deciding the appropriate sanction to impose).  The record in this case reveals some confusion regarding this principle, so we take this opportunity to clarify the appropriate role of a respondent's motive in judicial disciplinary proceedings.  The master concluded that respondent's actions in eight of the ten allegations were not misconduct because " 'his heart [was] in the right place' "  In rejecting the master's approach, the JTC stated that judicial misconduct must be reviewed under an objective, rather than subjective, standard.  We agree with the JTC that the standard for determining whether something constitutes judicial misconduct in the first place is an objective one. See *In re Ferrara*, 458 Mich 350, 362; 582 NW2d 817 (1998).  However, when determining the appropriate sanction for particular misconduct, the JTC (and this Court) may properly consider a respondent's subjective intent along with other mitigating and aggravating factors.  See, e.g., *In re Tschirhart*, 422 Mich 1207, 1209-1210 (1985)

suspensions in which the respondents' misconduct included, among other things, use of their judicial office for personal gain.[23]  In a disciplinary scheme that seeks to treat equivalent conduct equivalently and dissimilar conduct proportionately, the fact that we have imposed 90-day suspensions in cases involving conduct that typically warrants greater discipline is a relevant consideration in determining the appropriate sanction in this case.[24]

A second consideration persuading us to deviate from the recommended 90-day suspension is our assessment of the JTC's analysis of the first *Brown* factor.[25]  Under the first *Brown* factor, the JTC determined that respondent engaged in "a pattern of willfully disregarding the law and proper legal procedures in the handling of cases."  Although we

_____

(recognizing that the respondent's subjective intent "properly receive[s] consideration"); see also *Brown*, 461 Mich at 1293 (stating that "misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion" warrants a more severe sanction).  It does not appear that the JTC took respondent's motive into account when fashioning its recommended sanction.

[23] See *In re Thompson*, 470 Mich 1347 (2004); *In re Trudel*, 465 Mich 1314 (2002).

[24] For this same reason, we decline to equate this case to previous cases in which this Court imposed a 90-day suspension for the commission of a crime.  See *In re Nebel*, 485 Mich 1049 (2010) (operating a motor vehicle while visibly impaired in violation of MCL 257.625(3)); *In re Steenland*, 482 Mich 1230 (2008) (same); *In re Halloran*, 466 Mich 1219 (2002) (exposing genitals to undercover police officer, the facts of which constitute a violation of the indecent exposure statute, MCL 750.335a).  Needless to say, violation of the criminal law necessarily undermines a judge's ability to sit in judgment of others, which explains why this Court has consistently imposed at least a 90-day suspension for the perpetration of even a single crime.  The same cannot necessarily be said of the types of misconduct present in this case.

[25] The first *Brown* factors provides that "misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct[.]"  *Brown*, 461 Mich at 1292.

agree that some of the counts show a pattern of willful disregard of controlling legal authority, we believe the JTC overstated the pattern in this case.

Our review of the record reveals a pattern in *Orlewicz*, *Fletcher*, *McGee*, and *Boismier*—disregard of controlling authority, be it mandatory statutes or a superior court order. In each of these cases, respondent's decisions were controlled by unambiguous mandatory language, and in each case respondent defied the controlling authority. The rest of the cases, however, do not fit this pattern. Insofar as the remaining counts showed a "disregard[ for] . . . proper legal procedures," this "pattern" is so general that it could conceivably describe every instance of judicial misconduct on the bench, in which case the first *Brown* factor would be rendered meaningless. In cases like this, when the examiner alleges a collection of isolated incidents of misconduct, a more nuanced analysis is necessary to ensure that we treat "equivalent cases in an equivalent manner and . . . unequivalent cases in a proportionate manner."[26]

The remaining counts of misconduct—*Wilder*, *Redding*, *Moore*, and *Hill*—share nothing in common except for the fact that they constitute judicial misconduct. Although the number of instances of misconduct is an important consideration in determining the appropriate sanction in judicial discipline cases, the first *Brown* factor focuses specifically on whether the respondent continued to engage in the same type of judicial misconduct, thereby signifying judicial conduct more harmful to the integrity of the judicial system. In none of the remaining counts did respondent repeat the same type of misconduct. The remaining counts are too unrelated—occurring in separate cases and

---

[26] *Id*.

13

involving different types of misconduct—to constitute a meaningful pattern for purposes of the first *Brown* factor. In sum, the JTC overstated the extent to which the first *Brown* factor weighed in favor of a harsher sanction.

In determining the appropriate sanction in this case, we recognize that respondent's case is unlike any other case we have dealt with in recent years, which naturally makes it harder to identify an appropriate baseline on which to apply the *Brown* factors.[27] Many of respondent's acts of misconduct, taken alone, would probably warrant no more than a public censure. The other more serious instances of misconduct, taken alone, would likely merit a short suspension. However, when the allegations are aggregated and the body of misconduct is considered as a whole, a greater sanction is necessary to protect the integrity of the judiciary as an institution.[28] Mindful that the *Brown* factors weigh in favor of a more serious sanction—though not as heavily as the JTC's analysis implies—we conclude that a 60-day suspension is proper. In concluding that a deviation is warranted in this case, we acknowledge that at a prior stage in these

---

[27] The Chief Justice is correct that our judicial discipline jurisprudence lacks a formal framework for determining the appropriate level of discipline in a particular case, and this Court has begun taking steps to address this deficiency through our administrative process. But simply labeling the misconduct as "lawlessness" provides no substantive tools to assist the JTC and this Court in the yeoman's work of qualitatively assessing of the facts of future JTC cases in light of this and other JTC decisions. Because the JTC provided no meaningful explanation for why a 90-day suspension is proportionate to respondent's misconduct, it is incumbent upon this Court to independently assess the misconduct in the context of our prior decisions and legal principles to determine a sanction proportionate to respondent's misconduct. By doing so, we have answered the Chief Justice's call "to work to establish consistent and transparent standards for establishing levels of sanctions."

[28] See *In re Moore*, 464 Mich 98, 118; 626 NW2d 374 (2001).

14

proceedings, this Court stated that a 90-day suspension was appropriate on the facts presented at the time. However, after careful study of the record subsequently developed in this case, and in light of our previous judicial discipline decisions, we conclude that when a judge commits a series of legal errors for which there can be no colorable good-faith excuse, a 60-day suspension is a sufficiently severe sanction to protect the integrity of the judiciary while also maintaining fidelity to the overarching principle that equivalent conduct be treated equivalently.[29]

## III. CONCLUSION

Respondent's judicial misconduct requires that he be suspended in order to restore the public's faith and confidence in the judiciary. However, for the reasons stated above, we find that the recommended 90-day suspension is disproportionate to the judicial misconduct established on this record. We therefore modify the JTC's recommendation and order that Honorable Bruce U. Morrow, Judge of the 3rd Circuit Court, be suspended without pay from the performance of his judicial duties for a period of 60 days, effective

---

[29] We thus take no issue with the Chief Justice's conclusion that respondent's misconduct requires a significant sanction. Unlike the dissent, however, we believe a suspension of any length is a serious matter. We further believe that a 60-day sanction will make it clear to respondent, the bench, and the public that misconduct of this type will not be tolerated. We caution, however, that our decision today should not be read as setting the upper limit for this type of misconduct should future cases present additional aggravating circumstances or lack the mitigating circumstance presented here. In the absence of predetermined sanction guidelines, this Court must qualitatively assess respondent's misconduct in the context of prior JTC cases to determine where the misconduct falls on the spectrum. Although the dissent would equate respondent's misconduct to criminal behavior like indecent exposure, this Court is persuaded that violation of the criminal law and using one's judicial office for personal gain are qualitatively more serious than the set of disparate incidents of misconduct in this case, many of which, taken alone, would probably warrant no more than a public censure.

21 days from the issuance of this opinion.  Pursuant to MCR 7.317(C)(3), the Clerk is directed to issue the judgment order forthwith.

Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

S T A T E   O F   M I C H I G A N

SUPREME COURT

*In re* Honorable BRUCE U. MORROW,                    No. 146802
Judge, 3rd Circuit Court

_____

Young, C.J. (*concurring in part and dissenting in part*).

It is apparent that the majority believes the 90-day suspension recommended by the Judicial Tenure Commission (JTC) is too harsh. The question I believe the majority opinion does not answer well is why the majority's 60-day suspension is *more* consistent with the nature of the judicial misconduct found in this case than the recommended sanction. More important, the majority opinion does not provide a sanctioning rationale that will aid the JTC and this Court to understand how this case can or should be applied in the next case.[1] Because I believe that the 90-day suspension recommended by the JTC most appropriately addresses the extent of Judge Morrow's documented misconduct, I respectfully dissent.

The majority opinion correctly credits and accepts the factual findings of the JTC, and also correctly holds that respondent committed judicial misconduct in eight cases,

_____

[1] I believe the majority has made a serious effort to select an appropriate sanction in this case. My concern is not with the seriousness or the sincerity of that effort but with the absence of a universalizable rationale that permits one to apply the rationale of this case to the next. This, unfortunately, has become an increasingly obvious failing of our JTC sanctioning jurisprudence—a shortcoming the majority opinion does little to address other than to acknowledge that we must do better—in a future case.

consistent with the JTC's conclusions of law.[2]  However, the majority unjustifiably, in my view, departs from the JTC's recommendation for a 90-day suspension, no doubt in part because both this Court and the JTC have not been as diligent as we should have been in setting forth a coherent theory of discipline.  In the absence of such a theory, all involved—this Court, the JTC, and our judiciary—are left with no more guidance in any given case than some unarticulated sense of "rough justice" by which to set a sanction.

In *In re Brown*,[3] this Court expressed concern that, in the absence of principles to evaluate the severity of judicial misconduct, our judicial disciplinary system was not adequately faithful to the rule of law.[4]  To remedy this problem, we announced a series of standards to aid the JTC and this Court when evaluating judicial misconduct.[5]  These principles have subsequently guided this Court's evaluation of judicial misconduct.

While *Brown* provides a rubric for evaluating the misconduct itself, it does not provide the same guidance for the *amount of discipline* warranted in individual cases.  Since *Brown*, we simply have not done an adequate job of making transparent a coherent theory of how much sanction to apply in cases where judicial misconduct has been determined.  Similarly, despite our clear direction that it do so, the JTC has not developed standards to supplement the *Brown* factors.[6]  Other than the line we have drawn in cases

---

[2] I join the majority in accepting the JTC's findings of fact and conclusions of law.

[3] *In re Brown*, 461 Mich 1291 (2000).

[4] *Id*. at 1292.

[5] See *id*. at 1292-1293.

[6] See *id*. at 1292 ("[I]t is the burden of the JTC to persuade this Court that it is responding to equivalent cases in an equivalent manner . . . .  This burden can best be satisfied by the

2

where a judge has lied under oath,[7] principled consistency in our disciplinary decisions is hard to find. The consequences of these failures are apparent in the majority opinion in this case, which picks an alternate amount of sanctioning time than that recommended by the JTC but cannot explain why it has determined that 60 days *is* appropriate, while 90 days is not.

The JTC, as an expert agency, is accorded deference with respect to both "its findings of fact and its recommendations of sanction."[8] In this case, as is justified by the record, the Court rightfully deferred to the JTC's findings of fact. However, I believe the Court has not adequately justified its downward "deviation" from the JTC's recommended sanction of a 90-day suspension. The opinion picks two out of the five post-*Brown* decisions involving 90-day suspensions to establish a paradigm from which this case supposedly departs. The majority opinion claims that a chosen distinguishing characteristic that exists in those two cases, but not this one, is that the misconduct was

---

promulgation of standards by the JTC."); *id*. at 1293 ("The JTC should consider [the *Brown* factors] and other appropriate standards that it may develop in its expertise, when it offers its recommendations.").

I am pleased that the majority has reaffirmed that the JTC must establish such additional standards. It is my hope that now the JTC will finally act.

[7] See *In re Adams*, 494 Mich 162; 833 NW2d 897 (2013); *In re James*, 492 Mich 553; 821 NW2d 144 (2012); *In re Justin*, 490 Mich 394, 424; 809 NW2d 126 (2012) ("When a judge lies under oath, he or she has failed to internalize one of the central standards of justice and becomes unfit to sit in judgment of others.") (citation, quotation marks, and emphasis omitted); *In re Nettles-Nickerson*, 481 Mich 321; 750 NW2d 560 (2008); *In re Noecker*, 472 Mich 1; 691 NW2d 440 (2005).

[8] *Brown*, 461 Mich at 1292.

for personal gain.[9]   Since the misconduct in this case was not for personal gain, the majority opinion finds it appropriate to deviate downward to account for the lack of this aggravating factor.

The first problem with this approach is that the two cases from which the opinion extracts this claimed aggravating factor bear no factual resemblance whatsoever to this case; extracting from the ether general principles from disparate cases does not lend credence to our guiding principle that, under the rule of law, "equivalent misconduct should be treated equivalently."[10]   It may be that, when a judge acts for personal gain in his judicial capacity, a 90-day suspension is warranted.  Such a principle does nothing to explain why other kinds of misconduct do not also warrant a 90-day suspension, as this Court has obviously previously concluded.[11]   And this is the missing link in the majority's explanation of why it has chosen a 60-day suspension in preference to the recommended 90-day suspension.

Another difficulty with the opinion is that it simply fails to explain the significance of the three other post-*Brown* cases in which this Court has issued a 90-day suspension, two of which involved operating a motor vehicle while impaired,[12] and a third that involved a judge exposing himself to an undercover police officer while in a

---

[9] See *In re Thompson*, 470 Mich 1347, 1348-1349 (2004); *In re Trudel*, 465 Mich 1314, 1317 (2002).

[10] *Brown*, 461 Mich at 1292.

[11] See notes 12 and 13 of this opinion.

[12] See *In re Nebel*, 485 Mich 1049 (2010); *In re Steenland*, 482 Mich 1230 (2008).

public restroom.[13]  While in each of these five cases the Court meted out a 90-day suspension, that is the only thing they share in common.  Contrary to the majority's selective reliance on them, I submit there is no archetypal "90-day suspension" principle that can be extracted from any of these five prior disparate instances.  Our prior 90-day suspensions simply have resulted from a wide array of judicial misconduct.  The sanctions imposed in these cases are not linked by any unifying theory of sanctioning.  Thus, looking at the sanctions imposed constitutes no more than examining a scatterplot.  The majority errs in selectively picking among these disparate cases and providing a post hoc rationale to develop a unifying theme to justify its rejection of the JTC recommendation.  In imposing a 60-day sanction, the majority says little more than: "This case is not like the others."  This is surely an accurate observation but not one that explains why that difference dictates a particular sanction.  In short, I cannot see even a loose pattern linking together *any* of our previous 90-day suspension cases from which it can be said with candor that the judicial misconduct in *this case* warrants a lesser sanction or a "departure" from our other 90-day cases.

Moreover, the majority does not justify why it picked a 30-day downward deviation, as opposed to some other departure from the recommended sanction.  In doing so, the majority fails to explain why a 60-day suspension is a *justified* sanction for the misconduct it has found Judge Morrow to have committed.  Thus, this case will provide as much Delphic guidance on sanctioning standards in future cases as have our previous cases.  To be candid, the majority has provided nothing of value that this Court and the

---

[13] See *In re Halloran*, 466 Mich 1219 (2002).

5

JTC can look to in the future as sanction guidance. That is a significant failure in its opinion, but the majority has the candor to acknowledge that it is offering no more than a "one-off" decision here.

TOWARD A THEORY OF SANCTIONING APPLICABLE IN LATER CASES

The *Brown* factors generally indicate that *judicial* misconduct—that performed in one's official capacity as a judge rather than misconduct performed by one who happens to be a judge—is worthy of more significant sanction.[14] Further, judicial acts that affect the administration of justice are deemed far more invidious.[15] Finally, when such misconduct is part of a pattern, *Brown* counsels that greater sanctions are warranted.[16] All of these factors are implicated in Judge Morrow's misconduct here and weigh heavily in my calculation about the proper sanction that should be applied to him.

The Master benignly characterized Judge Morrow's repeated refusal to follow the law, concluding that Morrow refused to follow what he knew to be the law but that his "heart was in the right place." There is a simple name for this kind of conduct: lawlessness. When citizens break the law—even for good-hearted reasons—we still call them criminals. When judges do so—and do so repeatedly—they fundamentally undermine confidence in our judicial system and, most significantly, give lie to the oath

---

[14] See *Brown*, 461 Mich at 1292-1293.

[15] *Id*. at 1293.

[16] *Id*. at 1292.

of office they swore to uphold.  What can be worse to say of a judge than: "He refuses to follow the law"?[17]

I believe that the majority opinion fails to give sufficient weight to the fact that Judge Morrow has emphatically demonstrated on *eight separate occasions* that he believed himself to be above the law and was unwilling to be constrained by the law when he disagreed with it.  We do not permit our citizens to be lawless and we cannot tolerate a judge, who has taken an oath to *uphold* the law, to disrespect the law as he applies it to those who come before him.  Few things are less acceptable than a judicial system that tolerates legal rogues who wear black robes—even good-hearted ones.  Such a thing is incompatible with any notion of the rule of law.

Accordingly, unlike the majority, I am prepared to lay down a marker to guide future judicial sanctions in like cases:

> **When the record reflects that a judge has demonstrated a pattern of lawlessness in the discharge of his judicial duties (not mere mistakes in the application of the law), the sanction should presumptively be *no less than* a 90-day suspension without pay.**

This period—three months—is, in my mind, sufficiently long to forcefully bring to the attention of a judge, who has failed to appreciate the significance of his oath of office, why he holds the privilege of this high office *and* the import of his oath.[18]  Three months

---

[17] The majority opinion shies from making such a frank assessment of Judge Morrow's conduct.  Why is not entirely clear to me.  But where, as here, in the discharge of his official judicial duties, Judge Morrow repeatedly refused to apply what he *knew* to be the law, I think no euphemism is appropriate.  That is the *definition* of lawlessness, and we should not sugarcoat this simple fact when it is a judge engaged in disobeying the law rather than when a "mere" citizen does so.

[18] Note, by contrast, judges are permitted vacation time approaching that of the sanction

without pay is unquestionably a *serious* sanction that cannot be ignored or rationalized by a misbehaving judge. A sanction of three months without pay also sends a *far stronger* signal to the misbehaving judge and to the public that their Supreme Court understands that judges of Michigan are not held to a lesser standard than the very citizens who appear before such judges. Consequently, I would reserve a lesser sanction for cases that do not involve a repetitive pattern of judicial misconduct in the courtroom.

For these reasons, on this record, I believe that the JTC's 90-day sanction recommendation was entirely justified. I do not believe that the majority opinion has articulated a justification why eight separate acts of judicial lawlessness affecting the administration of justice warrant only a 60-day suspension. Obviously, to the majority, a "mere" eight acts of judicial lawlessness is not sufficient to justify a three-month suspension. One wonders how many acts of in-courtroom misconduct the majority would tolerate before considering a more exacting sanction. In the next case, we will be sure to hear the defense in support of an even lesser sanction than the majority metes out here: "But my client only willfully refused to apply the law five times!" What will be our response then?

While the cases of misconduct are obviously dissimilar, our varied sanctioning responses reveal that even our use of the *Brown* factors has not led to principled and consistent results or results that can be made to appear congruent case to case. To further illustrate the majority's problem with congruence, compare this case to *In re Halloran*, in which a judge exposed himself to an undercover police officer in a public restroom.

---

the majority opinion imposes.

8

Judge Halloran received a 90-day suspension.[19]  In this case, Judge Morrow committed misconduct *on the bench* no less than eight times, each time adversely affecting litigants in his court.  For this misconduct, Judge Morrow receives a 60-day suspension.  As stated, *Brown* instructs us that misconduct that is part of a pattern is more serious than isolated incidents, that misconduct on the bench is more serious than similar misconduct off the bench, and that conduct implicating the actual administration of justice or an appearance of impropriety is more serious than that which does not.[20]

Judge Halloran broke the law.  His conduct, as reprehensible as it might be, did not involve his *judicial* duties.[21]  Judge Morrow's conduct, however, affected *eight* sets of litigants in the cases over which he presided.  No crime committed by a judge is acceptable, but when the judge's misconduct occurs *in the courtroom* and adversely affects litigants, *that* conduct undermines the very foundation of the judiciary.  It is for that reason that I believe that Judge Morrow ought to be sanctioned at least equivalently to judges who break the law.  I submit that I have provided a rationale, consistent with *Brown*, that will provide a clear rule for future cases in which there is a pattern of

---

[19] *Halloran*, 466 Mich at 1219.

[20] 461 Mich at 1292-1293.

[21] The other two post *Brown* 90-day cases in which the judges broke the law outside the courtroom, *In re Nebel*, 485 Mich 1049 (2010), and *In re Steenland*, 482 Mich 1230 (2008), involved drunken driving.  It's hard to understand why a 90-day sanction for these out of court crimes is more worthy of a larger sanction than Judge Morrow's *repeated* misconduct *in the courtroom*.  I offer a theory to rationalize our misconduct cases so that they can be used in the future.  The majority does not.

misconduct affecting the administration of justice. The majority ought to provide a similar rationale for its preferred sanction.

Finally, the majority's result is particularly odd because the JTC actually recommended what this Court *unanimously* determined in a prior order: that a 90-day suspension would be an *appropriate* sanction. The JTC initially recommended public censure on the basis of four instances of misconduct.[22] In a confidential order entered on February 8, 2013, this Court concluded that the proposed public censure was insufficient for those four counts and determined that a 90-day suspension *was* appropriate.[23] Thereafter, the JTC discovered *four more* instances of misconduct and issued a new recommendation of a 90-day suspension, which is exactly what this Court stated was appropriate and which the majority has now rejected.[24]

If I were a member of the JTC, I certainly would be at a loss as to how to recommend an appropriate level of discipline after this Court simply changed its mind without explaining its reasons for doing so. Not only did the JTC's new findings *double*

---

[22] The four cases involving misconduct at this stage were *People v Orlewicz*, *People v Fletcher*, *People v Moore*, and *People v Hill*.

[23] We stated: "Given the facts stated in the stipulation, the proposed discipline is insufficient. The Court has determined that a suspension, without pay, for a period of 90 days, is an appropriate order of discipline."

[24] Again, I respectfully ask, why? What exactly is the majority's justification for delinking judicial "law violations" in determining that those unrelated to judicial duties are more worthy of sanction than those committed in the courtroom? I think the unspoken answer is that the majority does not believe that a judge's repeated willful refusal to obey and apply the law is really "breaking the law". Such conduct may not be criminal but it is inimical to the rule of law.

10

the number of cases of misconduct, I would submit that the newly discovered misconduct is, on balance, *more* troubling than the initial four cases that were subject to the censure agreement we rejected in our confidential order.[25]  The JTC should be mystified that this Court gave conflicting signs *in the same case*.  I am.

I fully recognize the numerous and various forms judicial misconduct can take, and that comparing them is a difficult task.  But this is no reason to avoid striving to standardize our system of judicial discipline.  Recognizing that the universe of possible misconduct is broad calls this Court to work to establish consistent and transparent standards for establishing levels of sanctions.  Without such guidance, this Court has failed to provide light and the JTC must act in the dark.  No one wants to be sanctioned by criteria not announced in advance; the rule of law requires more.

Because the majority opinion provides unsatisfactory reasons to depart from the JTC's recommendation—and this Court's prior conclusion that a 90-day suspension was appropriate for only half the misconduct now before us—I respectfully dissent from this portion of the opinion.  However, I join the majority's demand that the JTC actually undertake the task to create standards by which to assess judicial discipline in a manner

---

[25] The subsequently-uncovered misconduct included a second instance of ignoring plain statutory language and allowing a person convicted of first-degree criminal sexual conduct to remain out on bail pending sentence, see *People v McGee*; failing to hold a hearing with the parties present contrary to a Court of Appeals order, see *People v Boismier*; *sua sponte* dismissing a case despite a defendant's intention to plead guilty, see *People v Wilder*; and handing then-unidentified documents to a defendant whose trial he was about to preside over, *People v Redding*.

11

consistent with the rule of law.  I only wish this Court were more willing to give the JTC

an assist today.

Robert P. Young, Jr.

STATE OF MICHIGAN

SUPREME COURT

In re Honorable BRUCE U. MORROW,                    No. 146802
Judge, 3rd Circuit Court

_____

CAVANAGH, J. (*dissenting*).

Today, we must decide the proper sanction for respondent's judicial misconduct. However, this is not the first time we have considered this issue. In 2012, the Judicial Tenure Commission (JTC) and respondent entered a settlement agreement, and the JTC recommended that public censure was an appropriate sanction for respondent's misconduct. Despite the fact that this Court typically affords "considerable deference" to the JTC's recommendation, *In re Brown*, 461 Mich 1291, 1293 (2000), a majority of this Court rejected the JTC's recommendation of public censure and remanded to the JTC, *In re Morrow*, 493 Mich 878 (2012).

In contrast, after reviewing the JTC's first recommendation, the settlement agreement, the standards set forth in *In re Brown*, 461 Mich at 1292-1293, and the JTC's findings and conclusions, I concluded that public censure was appropriate. Accordingly, consistent with the deference we generally afford to the JTC's recommendations, I would have previously entered an order of public censure. *In re Morrow*, 493 Mich at 878 (CAVANAGH, J., dissenting). I continue to disagree with this Court's prior decision to reject the JTC's first recommendation and, consistent with my past position, I dissent

from the majority's decision to suspend respondent.  Instead, I would publicly censure respondent.

Michael F. Cavanagh