# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen
Kurtis T. Wilder

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

*In re* SIMPSON

Docket No. 150404. Argued October 6, 2016 (Calendar No. 1). Decided July 25, 2017.

The Judicial Tenure Commission (JTC) filed a formal complaint against 14-A District Court Judge J. Cedric Simpson, alleging three counts of judicial misconduct arising from an incident that occurred in Pittsfield Township on September 8, 2013. Around 4:22 a.m. on that date, Crystal M. Vargas, one of respondent's interns, was involved in a motor vehicle accident near respondent's home. Vargas immediately called respondent, and he arrived at the scene approximately 10 minutes after the accident had occurred. As the investigating officer was administering a field sobriety test, respondent identified himself to the officer as a judge, had a conversation with Vargas without the officer's permission, and asked the officer whether Vargas needed a ride. The investigating officer administered a preliminary breath test (PBT) to Vargas, which indicated that Vargas had a breath-alcohol content (BAC) over the legal limit, and she was placed under arrest. Later breathalyzer tests also indicated that Vargas's BAC was over the legal limit but showed a lower BAC than did the PBT. Respondent contacted the township attorney who would be handling Vargas's case, said that Vargas was his intern, and noted that Vargas would likely be involved in one of the attorney's upcoming mediation cases. Respondent also observed the discrepancy between the PBT and the breathalyzer results and requested a copy of the police report. Respondent later contacted the attorney to discuss defense attorneys Vargas might retain. After an investigation into respondent's conduct, the JTC filed its formal complaint alleging that respondent had interfered with the police investigation into the accident, interfered with Vargas's prosecution, and made misrepresentations to the JTC. The Honorable Peter Houk, the master appointed to the case, found by a preponderance of the evidence that respondent's actions constituted judicial misconduct on all three counts. The JTC agreed with these findings and concluded that respondent's conduct violated the Michigan Code of Judicial Conduct and also constituted misconduct in office and conduct clearly prejudicial to the administration of justice under Const 1963, art 6, § 30(2). The JTC recommended that respondent be removed from office and that costs of $7,565.54 be imposed on him. Respondent petitioned the Supreme Court, requesting that it reject or modify the JTC's decision and recommendation. Respondent also moved for a remand to the JTC to consider some allegedly exculpatory information he had not received but that had been disclosed to the JTC examiner. The Supreme Court remanded the case to the JTC, the JTC remanded the case to the master, and the master decided that his previous findings were unaffected by the new evidence. The JTC also decided that the evidence did not affect its decision and recommendation. Respondent's petition to reject or modify the JTC's decision and recommendation remained before the Court.

In an opinion by Justice VIVIANO, joined by Justices MCCORMACK, BERNSTEIN, and LARSEN, the Supreme Court *held*:

The JTC correctly found that respondent committed judicial misconduct, but it erred by concluding that removal from office was warranted. A suspension of nine months without pay was proportional to the misconduct. Respondent was properly ordered to pay costs of $7,565.54 because he engaged in conduct involving "intentional misrepresentations" or "misleading statements" under MCR 9.205(B).

1. The JTC properly concluded that the first two allegations of judicial misconduct against respondent—interference with the police investigation and interference with the prosecution—were proved by a preponderance of the evidence. With respect to the first allegation, the facts showed that respondent approached Vargas and the investigating officer as sobriety tests were being performed and interrupted the sobriety-testing process. Given that respondent was certainly aware that the officer was investigating whether Vargas was under the influence of alcohol or a controlled substance, when respondent introduced himself to the officer as "Judge Simpson," he either failed to prudently guard against influencing the investigation or used his judicial office in an effort to interfere with it. Next, respondent spoke to Vargas during the investigation without the officer's permission. Finally, respondent's question regarding whether Vargas simply needed a ride was a transparent suggestion to the officer to end his investigation and allow respondent to drive Vargas away from the scene. Respondent's behavior at the accident scene constituted judicial misconduct because he used his position as a judge in an effort to scuttle a criminal investigation of his intern. With respect to the second allegation, the evidence indicated that respondent interfered with the prosecution by improperly acting as Vargas's legal advocate. Respondent succeeded in delaying the issuance of charges against Vargas when he convinced the township attorney to hold off on the case. Respondent consulted the township attorney about the best defense attorney to represent Vargas, raised a question about the discrepancy between the results of the PBT and the breathalyzer, and requested a copy of the police report.

2. With respect to the third allegation—misrepresentations to the JTC—the JTC's finding that respondent made an intentional misrepresentation or a misleading statement when he testified under oath that he had not had contact with Vargas between midnight and 4:00 a.m. on the morning of the accident was not proved by a preponderance of the evidence. Although respondent's testimony about contacts during that time frame was inaccurate, his testimony suggested that he was uncertain about the contact, not that he intentionally misrepresented whether he and Vargas had contact. However, the JTC's finding that respondent made an intentional misrepresentation or a misleading statement with regard to the purpose of the thousands of text messages and phone calls he and Vargas exchanged from August 2013 through November 2013 was proved by a preponderance of the evidence. Respondent admitted to the voluminous contacts between himself and Vargas but indicated that the majority of the contacts concerned a complex case Vargas was working on for respondent, but the record indicated that respondent and Vargas had already engaged in an excessive amount of communication before respondent received the evidence in the complex case. Accordingly, the JTC's finding that respondent had made an intentional misrepresentation or a misleading statement was proved by a preponderance of the evidence. Although the JTC's findings were not based on facts alleged in

the complaint, because respondent did not challenge the JTC's findings on that basis, it was unnecessary to decide whether the JTC's consideration of facts not alleged in the complaint was improper.

3. Respondent's interference with the police investigation and prosecution of his intern along with the intentional misrepresentation or misleading statement he made in his answer to the complaint in explaining the nature of the extensive communications between him and Vargas warranted a nine-month suspension without pay and the imposition of costs. The JTC was generally correct in concluding that four of the seven factors set forth in *In re Brown*, 461 Mich 1291 (2000), weighed in favor of a more severe sanction. However, the Court's overriding duty in deciding the appropriate sanction to impose in judicial disciplinary proceedings is to treat equivalent cases of misconduct in an equivalent manner and unequivalent cases in a proportionate manner. The Supreme Court has consistently imposed the most severe sanction of removal on judges who testified falsely under oath. In this case, respondent's false statement regarding the nature of his extensive communications with Vargas was given in the answer to the complaint. The JTC did not prove that respondent's answer was verified as required by MCR 9.209(B)(1), and so it could not establish that the answer was given under oath. Accordingly, the most severe sanction of removal was not warranted in this case. Respondent's case was most akin to *In re Lawrence*, 417 Mich 248 (1983), because, in both cases, the respondent's misconduct included misuse of the judicial office to benefit another and a nontestimonial misrepresentation. Because the respondent in *Lawrence* was suspended without pay for nine months for similarly serious misconduct, an unpaid suspension of nine months was warranted in this case and was sufficient to protect the public from this type of judicial misconduct in the future. Under MCR 9.205(B), in addition to any other sanction imposed, a judge may be ordered to pay the costs, fees, and expenses incurred by the JTC in prosecuting the complaint if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation or if the judge made misleading statements to the JTC, the JTC's investigators, the master, or the Supreme Court. Because respondent engaged in conduct involving "intentional misrepresentation" or "misleading statements" under MCR 9.205(B), the JTC properly requested imposition of the costs, fees, and expenses it incurred in prosecuting the complaint.

4. Contrary to the suggestion of the partial dissent, there are many reasons not to address allegations of misconduct that were not found and recommended to the Court by the JTC. In particular, *In re Mikesell*, 396 Mich 517 (1976), held that to do so would violate our state's Constitution. It would also violate the court rules, which suggest that the Court has the authority only to accept or reject the recommendations of the JTC unless they relate to the sanction. Further, a respondent judge is entitled to notice of the charges and a reasonable opportunity to respond to them. Without such notice, it is not clear how a respondent judge would know which charges are at issue and, therefore, which ones he or she should substantively address when a case proceeds to the Michigan Supreme Court. Whatever could be said about such a regime, it would not provide a full panoply of procedural guarantees for adjudicating allegations of judicial misconduct.

Nine-month suspension without pay and costs of $7,565.54 imposed.

Chief Justice MARKMAN, joined by Justice ZAHRA, concurring in part and dissenting in part, would have considered an additional two occasions on which respondent lied under oath—without regard to the fact that the two lies were not reflected in the complaint's allegations or the JTC's recommendation—and weighed them accordingly to determine respondent's proper sanction. Respondent falsely responded, under oath, to a question before the master about his purpose in going to the accident scene, and he also gave a false explanation in his sworn testimony before the master to explain his purpose for calling the township attorney. The majority's rationale for not taking the two sworn lies into consideration is apparently that neither instance of misconduct was specifically alleged in the JTC's recommendation. These additional lies are further examples of the misconduct with which respondent is charged and, if taken into consideration, would increase the sanction imposed on respondent. Nothing in past caselaw supports the majority's implicit reasoning for its failure to consider the two additional lies. Misconduct discernable from the record does, under Michigan law, constitute a basis on which this Court may impose judicial discipline, even if that misconduct is not specifically identified in the JTC's recommendation. Morever, respondent in the instant case would suffer no prejudice or any miscarriage of justice were this Court to hold him accountable for his lies offered while under oath. Respondents are aware of their obligation to tell the truth in disciplinary proceedings and that they could be disciplined for false testimony. A respondent should also not be given a lesser sanction for a false statement in answer to the complaint's allegations simply because the JTC has failed to prove that the respondent's answers were verified. Any untrue statement by a respondent frustrates this Court's constitutional obligation to uphold the integrity and reputation of the judiciary. An appropriate sanction in this case should take into account all of respondent's lies.

Justice WILDER took no part in the decision of this case.

©2017 State of Michigan

# OPINION

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen
Kurtis T. Wilder

FILED  July 25, 2017

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable J. CEDRIC SIMPSON,
Judge, 14A District Court.

No. 150404

BEFORE THE ENTIRE BENCH (except WILDER, J.)

VIVIANO, J.

This case is before this Court on the recommendation of the Judicial Tenure Commission (JTC) that respondent, 14A District Court Judge J. Cedric Simpson, be removed from office and ordered to pay $7,565.54 in costs.  Respondent has filed a petition requesting that this Court reject or modify the recommendation.  After reviewing the record and considering the parties' arguments, we agree with the JTC that respondent committed judicial misconduct and that the imposition of costs is warranted.  However,

we disagree with the JTC that removal from office is warranted.  Instead, we conclude that a nine-month suspension without pay is the appropriate sanction.

## I.  FACTS

Respondent is a judge of the 14A District Court and therefore subject to the Michigan Code of Judicial Conduct.  He has no history of misconduct.  At the time relevant to this case, he was an adjunct professor at the Ann Arbor campus of Western Michigan University Cooley Law School.  During the 2013 summer term, Crystal Vargas was a student in respondent's Pretrial Skills class.  In June 2013, Ms. Vargas sought an internship with respondent in the 14A District Court.  Respondent accepted Ms. Vargas, and she started her internship on July 10, 2013.  Within days, respondent and Ms. Vargas began communicating with each other by telephone call and text message on a frequent basis.  Cellular records indicate that several thousand communications were exchanged between respondent and Ms. Vargas from July 23, 2013, to November 30, 2013.  Those communications were exchanged at all times of the day and night and on weekends as well.

On September 7, 2013, respondent and Ms. Vargas exchanged seven phone calls and numerous text messages.  This was consistent with their pattern of communication during that summer and fall.  On September 8, 2013, respondent and Ms. Vargas exchanged six text messages between 1:25 a.m. and 2:29 a.m., and they exchanged an additional six text messages between 4:20 a.m. and 4:23 a.m.  At about the time the latter group of text messages was exchanged, Ms. Vargas was involved in a motor vehicle

2

accident at the intersection of Platt Road and Michigan Avenue, less than two miles from respondent's home. Ms. Vargas called respondent at 4:24 a.m., shortly after the accident.

Within a few minutes, while Ms. Vargas was still on the phone with respondent, Pittsfield Township Police Officer Robert Cole arrived at the scene and began investigating whether Ms. Vargas was under the influence of alcohol. At about 4:30 a.m., as Officer Cole was administering field sobriety tests to Ms. Vargas, respondent arrived at the scene. Respondent approached Officer Cole and identified himself as "Judge Simpson." Officer Cole recognized respondent as a judge, stopped the tests, walked toward respondent, and proceeded to briefly explain that Ms. Vargas had been involved in an accident.[1] Respondent then approached Ms. Vargas without Officer Cole's permission and had a brief conversation with her. Officer Cole informed respondent that Ms. Vargas was okay and that he wanted to determine whether she was fit to drive. Respondent asked, "Well, does she just need a ride or something?" Respondent moved away from the immediate vicinity, and Officer Cole continued with the sobriety tests. Based on the results of the tests, Officer Cole administered a preliminary breath test (PBT) to Ms. Vargas. The PBT indicated that Ms. Vargas had a breath-alcohol content (BAC) of 0.137%, and Officer Cole placed her under arrest.

---

[1] Officer Cole later testified during the JTC proceedings that when a family member or friend arrives at the scene of such an investigation, he is trained to "tell them that I'll be back with them in ten or fifteen minutes, whenever I'm done figuring out if they've been drinking or not, and then go back and make contact with them." However, Officer Cole did not do so in this case "[b]ecause he's not just a family member. He's Judge Simpson, so I'm going to talk with him."

Afterward, respondent left the scene, and Ms. Vargas was transported to the Pittsfield Township Police Department. Because Officer Cole had never had a judge appear at an investigation scene, he promptly informed his supervisor, Sergeant Henry Fusik, about respondent's appearance. Sergeant Fusik, in turn, informed the Director of Public Safety, Chief Matthew Harshberger, about the situation. Sergeant Fusik instructed Officer Cole to process Ms. Vargas's case as he would any other case. Officer Cole subsequently administered two breathalyzer tests to Ms. Vargas, both of which indicated a BAC of 0.10%.

On September 10, 2013, the day before the police department issued a warrant request to Pittsfield Township Attorney Victor Lillich, Mr. Lillich received a telephone call from respondent. According to Mr. Lillich, respondent told him during the telephone conversation that Ms. Vargas was his intern and a "good kid" who was in a "pretty bad relationship." Respondent also told Mr. Lillich that Ms. Vargas "would be the one who would probably be doing some of the work" on an upcoming mediation case with which Mr. Lillich was involved. In addition, respondent observed that there was a discrepancy between the PBT and the breathalyzer results. Mr. Lillich responded that the discrepancy "would not be a big concern" in his decision to issue charges. Respondent requested, and Mr. Lillich agreed to provide him with, a copy of the police report.

On September 15, 2013, Mr. Lillich e-mailed the police report to respondent. In the e-mail, Mr. Lillich advised respondent that the case presented "nothing out of the

4

ordinary" beyond the discrepancy between the PBT and the breathalyzer results, and Mr. Lillich stated that he "would be authorizing an OWI 1st" charge against Ms. Vargas.[2]

On September 17, 2013, respondent again called Mr. Lillich. According to Mr. Lillich, the "conversation was primarily about" criminal defense attorneys. In particular, Mr. Lillich explained that he and respondent discussed the names of "good defense attorneys" that Ms. Vargas could retain. Additionally, Mr. Lillich agreed to "sit" on the case until Ms. Vargas retained an attorney.

In October 2013, Chief Harshberger sent an e-mail to Mr. Lillich inquiring about the status of the Vargas case. Mr. Lillich replied that he was "sitting on" the case "out of respect and defference [sic] to Judge Simpson." A few days later, however, Mr. Lillich returned the case to the Pittsfield Township Police Department as "denied," with a notation to refer the case to the county prosecutor. The return document indicated that Mr. Lillich disqualified himself from the case "to avoid any inference of impropriety" because respondent had contacted him regarding "his intern, Crystal Vargas."[3]

The JTC investigated respondent for his conduct related to the Vargas case. On November 12, 2014, the JTC filed a formal complaint against respondent, alleging that he had committed the following three counts of misconduct: (1) interfering with a police

---

[2] That is, Mr. Lillich indicated that he would authorize a charge of operating while intoxicated (OWI), first offense, under MCL 257.625(1).

[3] On October 28, 2013, the Pittsfield Township Police Department resubmitted the Vargas warrant request to the Washtenaw County Prosecutor's Office, and within a week, Ms. Vargas was charged with OWI, first offense. Following the disqualification of the entire 14A District Court bench, a visiting judge from the 53d District Court was assigned to the case. On January 8, 2014, Ms. Vargas pleaded guilty as charged.

investigation, (2) interfering with a prosecution, and (3) making misrepresentations to the JTC. On December 17, 2014, this Court appointed the Honorable Peter Houk to serve as master. The master conducted a three-day hearing and then issued his report on April 28, 2015, finding that each of the three counts of misconduct was proved by a preponderance of the evidence.

On September 1, 2015, the JTC issued its decision and recommendation for discipline. The JTC found by a preponderance of the evidence that respondent interfered with a police investigation, interfered with a prosecution, and made intentional misrepresentations or misleading statements to the JTC. Further, the JTC concluded that the misconduct constituted "misconduct in office" and "conduct . . . clearly prejudicial to the administration of justice," Const 1963, art 6, § 30(2),[4] and that respondent violated

---

[4] Const 1963, art 6, § 30(2) states as follows:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings.

6

the Michigan Code of Judicial Conduct Canons 1,[5] 2(A),[6] and 2(B),[7] as well as

MCR 9.104(1), (2), (3), and (4).[8] In determining the appropriate recommended sanction,

---

[5] Canon 1 states, in relevant part, as follows:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary.

[6] Canon 2(A) states as follows:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

[7] Canon 2(B) states, in relevant part, as follows:

> A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary.

[8] MCR 9.104 states, in relevant part, as follows:

> The following acts or omissions by an attorney, individually or in concert with another person, are misconduct and grounds for discipline, whether or not occurring in the course of an attorney-client relationship:
>
> (1) conduct prejudicial to the proper administration of justice;
>
> (2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;
>
> (3) conduct that is contrary to justice, ethics, honesty, or good morals;

the JTC assessed the factors set forth in *In re Brown*[9] and concluded that the misconduct implicated four of the seven *Brown* factors and thus "a more severe sanction" was warranted. The JTC then concluded "that removal from office [was] an appropriate and proportional sanction for Respondent's misconduct." In addition, the JTC requested the imposition of costs in the amount of $7,565.54 because "Respondent made intentional misrepresentations or misleading statements to the [JTC] in his answer to the formal complaint, and during his testimony at the public hearing."[10]

Thereafter, respondent filed a petition in this Court to reject or modify the JTC's decision and recommendation. In addition, respondent filed a motion to remand to the JTC for further proceedings based on allegedly exculpatory information that was disclosed as a result of a Freedom of Information Act (FOIA) request to the Pittsfield Township Department of Public Safety. Respondent claimed that the FOIA request revealed significant exculpatory evidence concerning the first two counts of the complaint that had been disclosed to the JTC examiner but not to respondent.[11] We remanded the case to the JTC. The JTC, in turn, remanded the case to the master for a

---

(4) conduct that violates the standards or rules of professional conduct adopted by the Supreme Court[.]

[9] *In re Brown*, 461 Mich 1291, 1291-1293; 625 NW2d 744 (2000).

[10] According to the JTC, the $7,565.54 amount represented "the costs, fees, and expenses incurred by the [JTC] in prosecuting the complaint. See MCR 9.205(B)."

[11] For instance, the alleged exculpatory evidence included a September 8, 2013 e-mail from Chief Harshberger to Sergeant Fusik stating that Officer Cole had "handled everything by the numbers."

determination of whether the evidence would alter his findings, how the nondisclosure occurred, and the reasons for the nondisclosure. After conducting a two-day hearing, the master concluded that the evidence did not alter his previous findings. In addition, the JTC concluded that the evidence did not affect its decision and recommendation.[12] Respondent's petition to modify or reject the JTC's decision and recommendation is now before this Court.

## II. STANDARD OF REVIEW

"Judicial tenure cases come to this Court on recommendation of the JTC, but the authority to discipline judicial officers rests solely in the Michigan Supreme Court."[13] This Court reviews de novo the JTC's findings of fact, conclusions of law, and recommendations for discipline.[14] "The Court may accept or reject the recommendations of the JTC or modify them by imposing greater, lesser, or entirely different sanctions."[15] The examiner has the burden to prove each allegation of judicial misconduct by a preponderance of the evidence.[16] " '[I]t is the JTC's, not the master's conclusions and recommendations that are ultimately subject to review by this Court.' "[17]

---

[12] Although we agree with the master and the JTC that this evidence was improperly withheld, we also agree that it does not materially exculpate respondent.

[13] *In re Morrow*, 496 Mich 291, 298; 854 NW2d 89 (2014).

[14] *Id*.

[15] *In re James*, 492 Mich 553, 559-560; 821 NW2d 144 (2012).

[16] *In re Morrow*, 496 Mich at 298.

[17] *In re Adams*, 494 Mich 162, 170 n 8; 833 NW2d 897 (2013), quoting *In re Chrzanowski*, 465 Mich 468, 481; 636 NW2d 758 (2001) (alteration in original).

9

### III. ANALYSIS

### A. FINDINGS OF FACT

### 1. COUNT 1: INTERFERENCE WITH THE POLICE INVESTIGATION

The JTC concurred with the master's finding with respect to Count 1, stating that "a preponderance of the evidence showed that Respondent used his judicial office to interfere, or to attempt to interfere, with the police investigation." We agree.

The facts show that respondent exited his vehicle and approached Ms. Vargas and Officer Cole as sobriety tests were being performed. Indeed, respondent *interrupted* the sobriety-testing process. Respondent, who had prosecuted numerous drunk-driving cases on behalf of Superior Township before he became a judge, was certainly aware that Officer Cole was investigating whether Ms. Vargas was under the influence of alcohol or a controlled substance. Given these circumstances, when respondent began his interaction with Officer Cole by introducing himself as "Judge Simpson," he appears at best to have failed to prudently guard against influencing the investigation and at worst to have used his judicial office in a not-so-subtle effort to interfere with the investigation. Indeed, but for respondent's status as a judge, Officer Cole would not have spoken to respondent until Officer Cole completed his investigation. Next, respondent spoke to Ms. Vargas during the investigation without Officer Cole's permission—another action an ordinary citizen would not have been permitted to take. Finally, respondent's question— "Well, does she just need a ride or something?"—was a transparent suggestion to Officer

Cole to end his investigation and allow respondent to drive Ms. Vargas away from the scene.[18]

We believe that respondent's behavior at the accident scene constitutes judicial misconduct. Respondent used his position as a judge in an effort to scuttle a criminal investigation of his intern. Count 1 was proved by a preponderance of the evidence.

## 2. COUNT 2: INTERFERENCE WITH THE CRIMINAL PROSECUTION

The JTC concurred with the master's finding with respect to Count 2, stating that "a preponderance of the evidence showed that Respondent interfered, or attempted to interfere, with the prosecution of the criminal case against Ms. Vargas." We agree.

The facts show that before Mr. Lillich, the township prosecutor, had even received a warrant request, respondent contacted him to discuss his intern's arrest.[19] Respondent described Ms. Vargas as a "good kid" who was in a "pretty bad relationship." In addition, respondent reminded Mr. Lillich that he had met Ms. Vargas in the past and would be working with her in the future. Finally, respondent raised an evidentiary issue—the discrepancy between the PBT and breathalyzer results. We believe respondent's purpose in making these statements was to advocate on behalf of Ms. Vargas and to persuade Mr. Lillich to deny the impending warrant request.

---

[18] As stated by the master, "Respondent's question clearly implies that he [was] available to short circuit the process."

[19] Because Mr. Lillich appeared in respondent's court, he was obviously aware of respondent's status as a judge.

11

After receiving a copy of the police report, respondent again contacted Mr. Lillich. During this conversation, as found by the master and the JTC, respondent discussed with Mr. Lillich potential defense attorneys to represent Ms. Vargas. In addition, the conversation resulted in Mr. Lillich's agreeing to "sit" on the case until Ms. Vargas retained an attorney who could discuss any potential "problems" with the case. Several weeks later, when Chief Harshberger inquired about the status of the case, Mr. Lillich acknowledged respondent's involvement in the matter and stated that he was "sitting on" the case out of respect and deference to respondent. Indeed, respondent's involvement in the case was cited as the reason that Mr. Lillich denied authorization of the warrant and disqualified himself.

We believe that each of these actions—individually and taken together—constitutes judicial misconduct. Respondent improperly acted as a legal advocate for Ms. Vargas and used his position as a judge to thwart the township's criminal prosecution of his intern. And he succeeded for a time in delaying the issuance of the charges. Count 2 was proved by a preponderance of the evidence.

### 3. COUNT 3: MISREPRESENTATIONS

With respect to Count 3, we are confronted with an unusual circumstance: None of the JTC's findings is traceable to the allegations of misconduct in the complaint.[20] The

---

[20] Indeed, both of the remaining allegations relate to facts occurring after the complaint was filed—the evidence on which the JTC relies is the answer to the complaint and a small portion of respondent's testimony under oath at the public hearing. It is clear that the JTC can proceed on additional charges arising after the complaint is filed, see e.g., MCR 9.209(B)(2) ("Wilful concealment, misrepresentation, or failure to file an answer and disclosure are additional grounds for disciplinary action under the complaint."). But MCR 9.213 provides the proper procedure for giving a respondent notice of the JTC's

12

JTC's allegations concerning respondent's alleged misrepresentations are contained in ¶¶ 64-85 of the complaint. Although the master found that certain of these allegations were proved by a preponderance of the evidence and that others were not,[21] the JTC did

___

intention to amend the complaint. If the complaint is amended, the respondent must be given an opportunity to defend against the charges. MCR 9.213 provides:

> The master, before the conclusion of the hearing, or the commission, before its determination, may allow or require amendments of the complaint or the answer. The complaint may be amended to conform to the proofs or to set forth additional facts, whether occurring before or after the commencement of the hearing. If an amendment is made, the respondent must be given reasonable time to answer the amendment and to prepare and present a defense against the matters charged in the amendment.

Like the JTC, we have declined to address charges that are not formally charged in the complaint. See *In re Hocking*, 451 Mich 1, 4-5; 546 NW2d 234 (1996) ("The commission also found a 'strong indication of a pattern of gender bias,' but refused to make a formal finding in this regard because gender bias was not an allegation formally charged in the complaint."); *id*. at 24 ("Thus, because the complaint did not charge, and the evidence does not establish, gender bias, we agree that such a conclusion is inappropriate."). See also *In re Hague*, 412 Mich 532, 563 n 11; 315 NW2d 524 (1982) ("The supplemental complaint to Formal Complaint No. 23 is the sole basis for the Court's [findings of misconduct] in this case.").

In this case, no amended complaint was filed. However, because respondent has not challenged the JTC's findings on this basis, we need not decide whether the JTC improperly considered facts not alleged in the complaint.

[21] The master made no findings of misconduct regarding the misrepresentations alleged in ¶¶ 64-67 of the complaint (regarding respondent's statements to the JTC about his contacts and relationship with Ms. Vargas), instead focusing, like the JTC did in its findings, on respondent's answer to ¶ 65, which is discussed in more detail later in this opinion. The master found that the allegations in ¶¶ 68-69 of the complaint (regarding respondent's reason for appearing at the accident scene) were proved by a preponderance of the evidence. The master did not address the allegations in ¶¶ 70-71 (regarding whether respondent spoke with Officer Cole while Officer Cole was administering sobriety tests to Ms. Vargas). The master found that the allegations in ¶¶ 72-75 (regarding whether respondent was truthful in his correspondence with the JTC concerning whether his actions at the scene intruded on Officer Cole's investigation and

not adopt any of these findings. Instead, the JTC made two additional findings not based on the allegations in the complaint, only one of which was addressed by the master.

In particular, the JTC found that respondent made "an intentional misrepresentation or misleading statement when he testified under oath at the public hearing that he had no contact with Ms. Vargas between midnight and 4:00 a.m. on September 8, 2013." The JTC also found that respondent made "an intentional misrepresentation or a misleading statement" in his answer to ¶ 65 of the complaint regarding the purpose of the large volume of telephone calls and text messages he exchanged with Ms. Vargas between August 1, 2013, and November 30, 2013. Because we have long held that our focus in judicial disciplinary proceedings is on the JTC's findings,[22] it is to those findings that we now turn.

---

whether he asked for, suggested, or implied that he wanted special treatment for Ms. Vargas), were proved by a preponderance of the evidence. The master found that the allegations in ¶¶ 76-79 (regarding whether respondent was truthful in his correspondence with the JTC concerning whether Ms. Vargas showed up at his home unexpectedly after her release from jail, and whether he only had "snippets" of conversations with Ms. Vargas after the date of the accident) were not proved. Finally, with respect to the allegations in ¶¶ 80-85 (regarding whether respondent was truthful in his correspondence with the JTC concerning the purpose of his interactions with the township attorney), the master concluded that respondent "was not truthful in his answers" for the reasons expressed elsewhere in the master's report.

[22] See *In re Mikesell*, 396 Mich 517, 524-526; 243 NW2d 86 (1976). In *In re Mikesell*, we explained that "[u]nder Const 1963, art 6, § 30(2), this Court may take action against a judge '[o]n the recommendation of the judicial tenure commission.' " *Id*. at 524 (second alteration in original). Applying the rule in that case, the Court explained:

> Thus, while the original complaint filed against the respondent contained 14 paragraphs of which 12 were allegations of misconduct, this Court concerns itself only with paragraphs 9-14 of the complaint. The Commission adopted and confirmed the report of the Master in all respects. The Master found that the allegations of paragraphs 3-8 of the complaint

The JTC first found that "[r]espondent made an intentional misrepresentation or misleading statement when he testified under oath at the public hearing that he had no contact with Ms. Vargas between midnight and 4:00 a.m. on September 8, 2013." In particular, the JTC found that the following exchange constituted a misrepresentation or misleading statement under oath:

> *Examiner*: Did you have any contact with Ms. Vargas between midnight and 3:30 that morning?
>
> *Respondent*: Which morning?
>
> *Examiner*: I'm sorry. On the day that she was -- on the morning she was arrested, did you have any contact with her between midnight and 3:30 or 4:00 that morning?
>
> *Respondent*: No.
>
> *Examiner*: And when you say no, that's not by text messages or anything else; correct?
>
> *Respondent*: I don't believe there were any text messages. I don't believe that there was any contact.

In fact, telephone records indicated that respondent and Ms. Vargas exchanged six text messages between 1:25 a.m. and 2:29 a.m. on September 8, 2013. Thus, respondent did not provide accurate information when he testified that he did not have any contact with Ms. Vargas during that time frame.

---

were not proven. *They are not part of the recommendation of the Commission and will not be considered by this Court*. [*Id*. (emphasis added).]

See also *In re Chrzanowski*, 465 Mich at 481 ("[P]ursuant to [Const 1963, art 6, § 30(2)], it is the JTC's, not the master's conclusions and recommendations that are ultimately subject to review by this Court.").

Nonetheless, it is not clear that respondent made an intentional misrepresentation to the JTC through this testimony. After answering "no" to the examiner's question about whether he had any contact with Ms. Vargas between midnight and 3:30 or 4:00 on the morning at issue, respondent equivocated by adding that he did not "believe" that there was any communication.[23] Moreover, respondent acknowledged during the hearing that he communicated with Ms. Vargas "into the evening" of September 7, 2013. And the JTC found that respondent did not testify falsely about his contacts with Ms. Vargas after 4:00 a.m. on September 8, 2013, i.e., the period during which the accident occurred. Therefore, considering this context, it appears that respondent simply may not have recalled the precise timing of a few of the many communications he had with Ms. Vargas—communications that were not central to the allegations of misconduct in this case.

We find that respondent's testimony on this point was careless and that he provided inaccurate information. However, we do not believe that the JTC has sustained its burden of proving by a preponderance of the evidence that respondent made an intentional misrepresentation or misleading statement regarding his contacts with Ms. Vargas before 4:00 a.m. on September 8, 2013. Consequently, we reject the JTC's conclusion that this alleged act constituted misconduct.

---

[23] And, perhaps as a result, the JTC equivocated as well, finding that "[r]espondent made an intentional misrepresentation or *misleading statement*." (Emphasis added.) That is, the JTC did not specifically find that respondent made "an intentional misrepresentation." If the JTC intended to communicate a finding that respondent made an "intentional misrepresentation," it should not have expressed its finding in the alternative.

Second, the JTC found that "[r]espondent made an intentional misrepresentation or a misleading statement regarding the purpose for the thousands of texts [sic] messages he exchanged with Ms. Vargas between August 1, 2013, and November 30, 2013." This particular finding refers to respondent's answer to ¶ 65 of the formal complaint, in which, after admitting the factual allegation, respondent stated that "the vast bulk of the communications related to a complex, sensitive project Ms. Vargas was working on for Judge Simpson in the case of *People v Nader Nassif*, #CRW 13-1244-FH." Under MCR 9.209(B)(1), the answer to the complaint must be "verified by the respondent." Although the answer was signed by respondent, the JTC has not shown that it was verified. There is no indication in the record that respondent verified the answer by oath or affirmation, MCR 2.114(B)(2)(a), or by a signed and dated declaration, MCR 2.114(B)(2)(b). Nevertheless, any misrepresentations or misleading statements in respondent's unverified answer may still be grounds for a finding of misconduct. See MCR 9.209(B)(2) ("Wilful concealment, misrepresentation, or failure to file an answer and disclosure are additional grounds for disciplinary action under the complaint.").

With regard to this finding of misconduct, we agree with the JTC that respondent made "an intentional misrepresentation or a misleading statement." The sheer number of communications—which were frequently exchanged during the night and on weekends— is inconsistent with respondent's explanation that the communications related to court business, including an in camera review of evidence in the *Nassif* case. Moreover, respondent testified that he learned that the *Nassif* case was assigned to him on August 11 or 12, and that his court did not receive the evidence for the in camera review until September 12. Yet respondent and Ms. Vargas had already exchanged a surfeit of

17

communications by then. In addition, this explanation was inconsistent with another explanation advanced by respondent—that the communications were attributable to the "problems" that Ms. Vargas was having with her former boyfriend, who allegedly had been violent toward her.[24]

On the basis of the foregoing evidence, we affirm the JTC's finding that respondent made "an intentional misrepresentation or a misleading statement" when he attributed the "vast bulk" of his communications with Ms. Vargas to the *Nassif* case.[25] We believe the JTC's finding has been proved by a preponderance of the evidence.

## B. CONCLUSIONS OF LAW

As stated above, the JTC concluded that respondent's misconduct constituted misconduct in office, Const 1963, art 6, § 30(2) and MCR 9.205; conduct clearly prejudicial to the administration of justice, Const 1963, art 6, § 30(2) and MCR 9.205; a failure to establish, maintain, enforce, and personally observe high standards of conduct

---

[24] While a judge may certainly defend against the charges within the bounds of the law, he or she cannot make knowingly false statements in the course of a JTC investigation. See generally, *In re Noecker*, 472 Mich 1, 18; 691 NW2d 440 (2005) (YOUNG, J., concurring) ("[W]here a respondent is not repentant, but engages in deceitful behavior during the course of a Judicial Tenure Commission disciplinary investigation, the sanction must be measurably greater.").

[25] Although there is no direct evidence of the precise nature of the relationship between respondent and Ms. Vargas, it is evident based on the multitudinous communications between them that the relationship far exceeded the professional boundaries we would expect in any workplace, especially in a judge's chambers. However, the JTC did not make any charges against respondent for having an inappropriate relationship with his intern. Instead, the formal complaint alleged only that he made false statements to the JTC concerning the nature and extent of his relationship, personal contacts, and communications with Ms. Vargas—allegations that were not resolved by either the master or the JTC in their respective findings.

so that the integrity and independence of the judiciary may be preserved, contrary to Canon 1; irresponsible or improper conduct that erodes public confidence in the judiciary, contrary to Canon 2(A); conduct involving impropriety and the appearance of impropriety, contrary to Canon 2(A); a failure to respect and observe the law and to conduct oneself at all times in a manner that would enhance the public's confidence in the integrity and impartiality of the judiciary, contrary to Canon 2(B); conduct that is prejudicial to the proper administration of justice, contrary to MCR 9.104(1); conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach, contrary to MCR 9.104(2); conduct that is contrary to justice, ethics, honesty, or good morals, contrary to MCR 9.104(3); and conduct that violates the standards or rules of professional conduct adopted by the Supreme Court, contrary to MCR 9.104(4).[26]

We agree with the JTC in most respects but we decline to decide whether respondent committed misconduct in office, contrary to Const 1963, art 6, § 30(2) and MCR 9.205, because it is not necessary for us to reach that question.[27]

---

[26] We note that it is unclear whether MCR 9.104 even applies in this context because that rule, and the entire subchapter in which it appears, governs professional disciplinary proceedings before the Attorney Discipline Board—not disciplinary proceedings before the JTC; however, because respondent has not challenged the JTC's conclusions on this basis, we do not address the issue.

[27] Respondent argues that he cannot be found liable for "misconduct in office" because his conduct did not constitute the common-law offense of misconduct in office. See *People v Coutu*, 459 Mich 348, 354; 589 NW2d 458 (1999), quoting Perkins & Boyce, Criminal Law (3d ed), p 543 ("At common law, misconduct in office constituted 'corrupt behavior by an officer in the exercise of the duties of his office or while acting under color of his office.' "). Although this Court has not yet addressed whether "misconduct in office," under Const 1963, art 6, § 30(2) and MCR 9.205(B), is limited to the common-law offense, we have repeatedly suggested that it is not so limited. See, e.g., *In re Probert*, 411 Mich 210, 234-235; 308 NW2d 773 (1981) (in which the respondent,

19

## C. SANCTION

The JTC recommends that this Court remove respondent from office as "an appropriate and proportional sanction for Respondent's misconduct" because respondent "intentionally used his status as a judge in an attempt to influence the investigation and prosecution of [a] criminal case for the benefit of his intern" and "made intentional misrepresentations or misleading statements, under oath, at the public hearing and in his answer to the formal complaint." The JTC arrived at this recommendation after assessing the *Brown* factors and concluding that "a more severe sanction" was warranted. The seven *Brown* factors are as follows:

> (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;
>
> (2) misconduct on the bench is usually more serious than the same misconduct off the bench;
>
> (3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;
>
> (4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

___

among other acts of misconduct, "procured an employment test for his friend, and assisted her in preparing answers in advance of the test," and this Court agreed with the JTC that the respondent was liable for misconduct in office and conduct clearly prejudicial to the administration of justice because those acts were "within the purview of Const 1963, art 6, § 30, and GCR 1963, 932.4") (quotation marks omitted). We need not address whether respondent may be found liable for "misconduct in office," however, given our conclusion that respondent engaged in "conduct that is clearly prejudicial to the administration of justice" under the same constitutional provision and therefore may be sanctioned by this Court.

20

(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.[28]

The JTC stated that four of the seven *Brown* factors weighed in favor of a more serious sanction; only the first and seventh factors did not. The JTC's discussion of the second factor did not specifically address whether the second factor weighed in favor of a more serious sanction. We generally agree with the JTC's assessment. With regard to the first factor, we agree with the JTC that the factor does not weigh in favor of a more serious sanction because "[t]here was no evidence . . . that Respondent repeated similar misconduct in other cases." Indeed, we find it noteworthy that there is no evidence that respondent committed *any* misconduct in other cases, which we bear in mind when determining the appropriate sanction. With regard to the second factor, the JTC properly noted that respondent's misconduct did not occur on the bench but nonetheless involved his position as a judge. The third and fourth factors counsel a graver sanction because, as the JTC discussed, respondent interfered in a criminal investigation and prosecution, then misrepresented certain facts during the JTC investigation. The fifth factor weighs in favor of a more severe sanction because respondent's repeated efforts to prematurely end

---

[28] *In re Brown*, 461 Mich at 1292-1293.

21

Ms. Vargas's criminal matter, as well as his lack of candor in the JTC proceedings, evidence a premeditated endeavor to commit misconduct. Regarding the sixth factor, we agree with the JTC that it justifies a greater sanction, albeit on different grounds. As noted above, we disagree with the JTC's conclusion that respondent made intentional misrepresentations or misleading statements at the public hearing. However, we conclude that respondent's misconduct in interfering with the police investigation and criminal prosecution undermined the ability of the justice system to discover the truth of what occurred in the legal controversy involving Ms. Vargas. As for the seventh factor, the JTC appropriately observed that respondent's misconduct did not relate to any protected classes.

"This Court gives considerable deference to the JTC's recommendations for sanctions, but our deference is not 'a matter of blind faith[.]' "[29] "Instead, it 'is a function of the JTC adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline.' "[30] "This Court's overriding duty in the area of judicial discipline proceedings is to treat 'equivalent cases in an equivalent manner and . . . unequivalent cases in a proportionate manner.' "[31] We decline to adopt the JTC's recommended sanction of removal from office.

---

[29] *In re Morrow*, 496 Mich at 302, quoting *In re Brown*, 461 Mich at 1292 (alteration in original).

[30] *In re Morrow*, 496 Mich at 302, quoting *In re Brown*, 461 Mich at 1292.

[31] *In re Morrow*, 496 Mich at 302, quoting *In re Brown*, 461 Mich at 1292.

In this case, as explained previously, respondent attempted to and did interfere with a police investigation and the prosecution of his intern. Moreover, respondent made an intentional misrepresentation or misleading statement in his answer to the complaint when he claimed that the "vast bulk" of communications between him and Ms. Vargas concerned the *Nassif* case. The public has a right to expect more of its judges. "As the cornerstone of our tripartite system of government, the judiciary has a public trust to both uphold and represent the rule of law."[32] Our judicial system depends on public confidence in the integrity and impartiality of the judiciary.[33] Because the people " 'are entitled to a judiciary of the highest integrity, in both appearance and in fact,' " this Court " 'bears the obligation under the constitution adopted by "we the people" to maintain and enforce standards of judicial fitness.' "[34]

We have previously sanctioned judges for attempting to interfere in the legal process on behalf of themselves or others. In *In re Brown*, the respondent was involved in an automobile accident, he knew one of the responding police officers, he informed the officers that the other driver was speeding, and he requested that they issue her a ticket.[35] The JTC found that the respondent was " 'attempting to use the prestige of [his] office to

---

[32] *In re Hocking*, 451 Mich at 6.

[33] *In re Ferrara*, 458 Mich 350, 372; 582 NW2d 817 (1998).

[34] *In re McCree*, 495 Mich 51, 83 n 39; 845 NW2d 458 (2014), quoting *In re James*, 492 Mich 553, 574; 821 NW2d 144 (2012) (MARKMAN, J., concurring in part and dissenting in part).

[35] *In re Brown (After Remand)*, 464 Mich 135, 136-137; 626 NW2d 403 (2001).

23

gain a personal advantage.' "[36] This Court adopted the JTC recommendation of a 15-day suspension without pay.[37] In *In re Mazur*, the respondent attempted to assist a former neighbor whose daughter had been arrested by contacting the judge assigned to the case and asking the judge to release her on a personal recognizance bond.[38] Pursuant to the settlement agreement between the JTC and the respondent, this Court imposed a public censure and a 30-day suspension without pay.[39] And in *In re Lawrence*, the respondent committed five acts of misconduct, one of which was the improper use of his judicial office to influence a licensing agency for the benefit of an acquaintance.[40] In particular, the respondent "clearly stated that [the respondent's acquaintance], the applicant for a gun permit, was a probation officer and was required to go into the inner city of Detroit at all hours during the course of his probation duties."[41] This Court stated that "[s]uch information was not true and was clearly a misrepresentation"[42] and imposed, for that and other misconduct, a nine-month suspension without pay.[43]

---

[36] *Id*. at 137 (alteration in original).

[37] *Id*. at 141.

[38] *In re Mazur*, 498 Mich 923, 925 (2015).

[39] *Id*. at 926.

[40] *In re Lawrence*, 417 Mich 248, 261; 335 NW2d 456 (1983).

[41] *Id*.

[42] *Id*.

[43] *Id*. at 267.

We have also previously sanctioned judges for making misrepresentations while not under oath. In *In re Lawrence*, as noted previously, the respondent made a misrepresentation in a letter to a licensing agency.[44] In *In re Binkowski*, the respondent modified a letter that was sent to him by the JTC "to convey to his colleagues the erroneous impression that the outcome of the commission's inquiry into the grievances which had been filed [against him] was a straightforward and unencumbered dismissal of those grievances."[45] This Court imposed a public censure against the respondent.[46] In *In re Milhouse*, the respondent filed a judgment of sentence falsely indicating that the criminal defendant had waived his right to counsel and pleaded guilty to the charged offense.[47] During the JTC investigation, the respondent "submitted a written reply to the grievance. In that reply, [he] did not make a full and fair disclosure and knowingly made false and misleading statements that he had mistakenly entered the judgments and closed the files and that it was not his intent to falsify documents or deprive [the criminal defendant] of his right to due process."[48] In addition, in his answer to the 28-day letter,[49] the respondent "did not make a full and fair disclosure and knowingly made false and

---

[44] *Id.* at 261.

[45] *In re Binkowski*, 420 Mich 97, 105-106; 359 NW2d 519 (1984).

[46] *Id.* at 107.

[47] *In re Milhouse*, 461 Mich 1279, 1280 (2000).

[48] *Id.* at 1281.

[49] A 28-day letter is a letter of inquiry from the JTC to the judge under investigation. See *In re Ferrara*, 458 Mich at 355 n 6.

misleading statements that he had mistakenly closed the files and he had not intended to knowingly and purposely deprive [the criminal defendant] of his due process rights."[50] In accordance with the JTC's recommendation and the respondent's consent, this Court imposed a public censure and a 10-day suspension without pay, with credit given for a 10-day suspension already imposed by the district court.[51] Finally, in *In re Radzibon*, the respondent committed acts of misconduct that included filing "a false and incomplete inventory of estate assets" when acting as an attorney in a probate court.[52] This Court, with the respondent's consent, adopted the JTC recommendation of a 90-day suspension without pay and restitution of $1,000 for the respondent's acts of misconduct.[53]

We acknowledge that "[t]his Court has consistently imposed the most severe sanction by removing judges for testifying falsely under oath."[54] However, in each case in which this Court has removed a judge for testifying falsely under oath, the judge testified falsely at the JTC hearing itself or another court hearing.[55] That is, in each of

---

[50] *Id.*

[51] *Id.* at 1279.

[52] *In re Radzibon*, 457 Mich 1201, 1204 (1998).

[53] *Id.* at 1205.

[54] *In re Adams*, 494 Mich 162, 186; 833 NW2d 897 (2013).

[55] See *In re Ryman*, 394 Mich 637, 643; 232 NW2d 178 (1975) ("The master further found that the respondent gave false testimony in a number of instances in testifying before the master as to the facts related to his practice of law after ascending [to] the bench."); *In re Ferrara*, 458 Mich at 362-363 ("Respondent displayed a similar disregard for the truth, as well as a lack of candor with the tribunal, when she answered questions before the master and this Court regarding whether she uttered the ugly words disseminated to the public by, and attributed to her in, the press."); *In re Noecker*, 472 Mich at 9; ("[The JTC] found that [respondent] failed to offer credible testimony when

26

those cases, the judge apparently gave one or more false answers after swearing to testify truthfully. Here, in contrast, the false statement concerning the *Nassif* case was given in the answer to the complaint, which the JTC has not proved was verified as required by MCR 9.209(B)(1). Absent such proof, we cannot conclude that the false statement in the answer was given under oath.[56] Therefore, we do not believe that the most severe sanction of removal is warranted in this case. Instead, as *In re Milhouse* illustrates, when a judge engages in misconduct by making an intentional misrepresentation or a misleading statement while not under oath in the course of a JTC investigation, a lesser, though still serious, sanction may be warranted.

We find that this case is most akin to *In re Lawrence* because in both cases, the respondent's misconduct included misuse of the respondent's judicial office to benefit

---

under oath in the public hearing."); *In re Nettles-Nickerson*, 481 Mich 321, 337; 750 NW2d 560 (2008) ("Respondent's act of perjury in her divorce case undermined the ability of the justice system to discover the truth of her ex-husband's residency, which if known at the time of Respondent's misrepresentations would have prompted the Kent County Circuit Court to conclude that it lacked jurisdiction over the proceeding."); *In re James*, 492 Mich at 556 ("[Respondent] made numerous misrepresentations of fact under oath during the investigation and hearing of this matter."); *In re Justin*, 490 Mich 394, 396; 809 NW2d 126 (2012) ("Instances of respondent's judicial misconduct include . . . making false statements under oath during the JTC hearing."); *In re Adams*, 494 Mich at 171 ("The master and the JTC both found that respondent made false statements under oath in Judge Brennan's courtroom. We agree."); *In re McCree*, 495 Mich at 66-67 ("[T]he JTC found that 'Respondent engaged in a pervasive pattern of dishonesty that included lying under oath to the Commission and to the Master.' For example, respondent testified that it did not 'dawn' on him to recuse himself from the *King* case and that his failure to recuse himself was a mere 'oversight.' ").

[56] We do not address whether removal would be justified if a judge makes an intentional misrepresentation or misleading statement in an answer that is properly verified because that question is not presently before us.

another and a nontestimonial misrepresentation. In *In re Lawrence*, there were additional unrelated allegations of misconduct, including allegations that the judge had assigned cases to attorneys with whom he had financial ties,[57] that the judge had an interest in a liquor license in direct contravention of a statute,[58] and that the judge had improperly retained campaign funds.[59] However, we believe that the allegations in this case— although fewer in number—are of equivalent seriousness. Respondent used his position as a judge to repeatedly attempt to thwart the criminal investigation and prosecution of his intern. This was not a one-time occurrence—rather, from the time respondent arrived at the accident scene until the time Ms. Vargas was charged by a substitute prosecutor, respondent made a sustained effort to scuttle the charges. And respondent was not forthcoming in his answer to the formal complaint about the reason for his interactions with Ms. Vargas. Because the respondent in *In re Lawrence* was suspended without pay for nine months for similarly serious misconduct, we believe that an unpaid suspension of nine months is warranted here.

In our judgment, bearing in mind that respondent has no other history of misconduct, a nine-month unpaid suspension is a proportionate sanction. That sanction is greater than the sanctions imposed in *In re Brown* and *In re Mazur* for misusing the judicial office to benefit the judge or another person. It is also greater than the sanctions imposed against each respondent in *In re Binkowski*, *In re Milhouse*, and *In re Radzibon*

---

[57] *In re Lawrence*, 417 Mich at 253.

[58] *Id*. at 256-257.

[59] *Id*. at 262.

for nontestimonial misrepresentations. We believe our sanction here must be greater than those sanctions because respondent engaged in a *sustained* campaign to prevent Ms. Vargas from facing legal consequences for her actions by interfering with a police investigation and the subsequent prosecution, in addition to providing false information in his answer to the formal complaint.[60] We conclude that a nine-month suspension without pay is consistent with our caselaw and will protect the public from this type of judicial misconduct.[61]

## IV. RESPONSE TO THE PARTIAL DISSENT

The partial dissent accuses us of "misreading . . . the law" because we do not address allegations of misconduct that were not found and recommended to us by the JTC. There are many reasons not to address such allegations—for one thing, it would violate our state's Constitution, as we held in *In re Mikesell* over 40 years ago.[62] It would

---

[60] To assert, as the partial dissent does, that we have not held respondent accountable for his lack of candor in his answer to ¶ 65 of the formal complaint is a misreading of our opinion. What we presume the partial dissent means is that we did not accord this misconduct sufficient weight and therefore failed to impose some unspecified greater sanction that the partial dissent believes would be appropriate. Left unanswered is the critical question of *precisely what additional weight* the partial dissent would accord this misconduct—the partial dissent has not told us whether it believes that its reweighing of the evidence justifies increasing the sanction by an additional day, week, month, or year, or whether it agrees with the JTC that removal from office is the appropriate sanction in this case.

[61] See *In re Jenkins*, 437 Mich 15, 28; 465 NW2d 317 (1991) ("The purpose of [judicial disciplinary] proceedings is not to impose punishment on the respondent judge, or to exact any civil recovery, but to protect the people from corruption and abuse on the part of those who wield judicial power.").

[62] See note 22 of this opinion. The partial dissent's attempt to narrow *In re Mikesell*—by urging that this Court may consider allegations "not reflected in the JTC's findings"—is unpersuasive. See note 2 of the partial dissent. Allegations of misconduct left

unaddressed by the JTC are, by definition, not recommended to us by the JTC. The issue of the scope of our review in JTC cases was squarely presented and decided in *In re Mikesell*, where we held that our Constitution requires us to focus on the findings and recommendations of the JTC, not on the findings of the master. See *In re Mikesell*, 396 Mich at 524-526; see also *In re Chrzanowski*, 465 Mich at 481 (reiterating the same point, albeit without citing *In re Mikesell*). That holding has never been overturned, or even criticized; it remains good law. See *People v Jamieson*, 436 Mich 61, 79; 461 NW2d 884 (1990) ("Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent which should not be lightly departed."). The partial dissent accuses us of "self-impos[ing]" the limitation on our scope of review in JTC matters; however, the limitation was actually imposed by the people of our state when they voted to amend our Constitution in 1968. See Const 1963, art 6, § 30. The question whether their judgment was sound (i.e., whether, in the partial dissent's words, it was "dubious public policy") is not for us to decide. See *Durant v Michigan*, 456 Mich 175, 220; 566 NW2d 272 (1997) ("The people having spoken through their constitution, the policy debate is no longer open.").

More troubling still is the partial dissent's suggestion that *In re Mikesell* may have been overruled by implication, i.e., that an inconsistent application of the law is sufficient to overrule an express holding of this Court. Allowing a case to "slip[] down a memory hole," *People v Ream*, 481 Mich 223, 232 n 7; 750 NW2d 536 (2008), is a poor substitute for "deliberately examin[ing] and decid[ing]" a principle of law. *Jamieson*, 436 Mich at 79. Unlike *People v Wilder*, 411 Mich 328; 308 NW2d 112 (1981), the case we said was implicitly overruled in *Ream*, our holding in *In re Mikesell* has never been called into question or criticized. And, contrary to the partial dissent's suggestion, *In re Mikesell* and *In re Chrzanowski* are not the only cases in which this Court has applied the principle of limiting its review to the particular allegations of misconduct found proved by the JTC. See, e.g., *In re Bennett*, 403 Mich 178, 184; 267 NW2d 914 (1978) ("We have reviewed the entire record *de novo* and conclude that the conduct charged to Judge Bennett and found by the Commission is established by the record. The issues for our consideration, then, are whether *that conduct* is of a nature warranting discipline and, if so, whether removal, as recommended by the Commission majority, or some other form of discipline should be imposed.") (emphasis added); *In re Laster*, 404 Mich 449, 455; 274 NW2d 742 (1979) ("We have reviewed the entire record *de novo* and conclude that the conduct attributed to Judge Laster, and found by the Commission, is established."); *In re Lawrence*, 417 Mich at 266 (1983) ("Upon *de novo* review of the record in this case, we find that the allegations of misconduct found by the commission are supported by the evidence."); *In re Callanan*, 419 Mich 376, 383; 355 NW2d 69 (1984) ("Respondent admitted that the facts as alleged in the indictment gave rise to discipline, but not that the facts alleged were true. As a result, we consider *only those facts found by the commission* which have been admitted, that respondent was indicted and has been three times

30

also violate our court rules, which suggest that we have the authority only to "accept or reject the recommendations of the [JTC]" unless they relate to the sanction, in which case we may "modify the recommendations by imposing a greater, lesser, or entirely different sanction."[63]

The partial dissent argues that three cases, postdating *In re Mikesell*, are inconsistent with it and therefore may have overruled *In re Mikesell*'s holding *sub silentio*: *In re Ferrara*, *In re Adams*, and *In re McCree*. We disagree. A close review of each of those cases indicates that this Court would have imposed the same sanction

---

convicted, and the legal conclusions that can be drawn from them.") (emphasis added); *In re Jenkins*, 437 Mich 15, 18 n 1; 465 NW2d 317 (1991) ("The master permitted amendment of the original complaint to include charges that respondent failed to respond timely to the original complaint, and that respondent harassed nine witnesses by filing defamation lawsuits against them. *Neither the master nor the commission stated any findings or made any recommendations with regard to these charges, and we therefore do not address them*.") (emphasis added); *In re Seitz*, 441 Mich 590, 594; 495 NW2d 559 (1993) ("It becomes our task, by reviewing de novo the record of this case, to conclude whether 'the conduct charged to Judge [Seitz] and found by the Commission is established by the record. The issues for our consideration, then, are whether that conduct is of a nature warranting discipline and, if so, whether removal, as recommended by the Commission majority[,] or some other form of discipline should be imposed.' "), quoting *In re Bennett*, 403 Mich at 184; *In re Moore*, 464 Mich 98, 122; 626 NW2d 374 (2001) ("In reviewing the record de novo, *we consider whether the conduct charged and found by the commission is established by the record*, whether the conduct is of a nature warranting discipline, and whether the discipline recommended by the commission or some other form of discipline should be imposed.") (emphasis added). See also *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971) (limiting the Court's de novo review to the three particular findings of misconduct made by the JTC and alleged in the complaint).

[63] MCR 9.225. See also *In re Hathaway*, 464 Mich 672, 685; 630 NW2d 850 (2001) ("The court rule states our authority to modify a recommendation of the commission, and the meaning of the word 'modify' encompasses authority to alter the recommended discipline.").

31

recommended by the JTC—removal from office—regardless of the additional determinations of misconduct.[64]  Even conceding, arguendo, that the applications in the cases relied on by the partial dissent could be read as inconsistent with *In re Mikesell*, those cases never cited the *In re Mikesell* holding applied here, and the issue of this

---

[64] See Garner et al., The Law of Judicial Precedent (2016), p 300 ("If at all possible, the opinions [perceived as conflicting] should be harmonized.").  In *In re McCree*, this Court expressly qualified its additional determinations of misconduct by explaining that those determinations did not affect the ultimate sanction.  *In re McCree*, 495 Mich at 71 ("Although we believe that the sanctions recommended by the JTC, and adopted by this Court today, would be warranted even without considering these additional findings of fact, we believe that these additional findings provide relevant background and context and demonstrate more fully the nature and magnitude of respondent's misconduct.").  In *In re Adams*, this Court adopted the JTC's determination that the respondent made false statements under oath during her divorce case.  *In re Adams*, 494 Mich at 171 ("The master and the JTC both found that respondent made false statements under oath in Judge Brennan's courtroom.  We agree.").  Then, after identifying additional instances "of varying significance" of the respondent's having testified falsely under oath, instances that were not identified by the JTC, *id*. at 177, this Court ordered that the respondent be removed from office because the respondent "testif[ied] falsely under oath."  *Id*. at 178.  We explained that we could "discern no compelling reason to treat this case any differently" from previous cases in which this Court had removed a judge for testifying falsely under oath.  *Id*. at 186.  The Court gave no indication that it would have deviated from those previous cases but for the additional instances in which the respondent had lied under oath.  Finally, in *In re Ferrara*, although one of the grounds of misconduct included inappropriate, untruthful, and evasive statements made to the press, to the public, to the master, to the JTC, and to this Court (when the respondent judge apparently addressed the Court on her own behalf during oral argument), and the opinion does discuss the statements made to this Court in some detail, see *In re Ferrara*, 458 Mich at 363-365, the statements made to this Court were simply a continuation (and perhaps a more vivid illustration) of the improper statements made by the respondent in the other venues (which were included in the JTC's recommendation).  In light of the nature and severity of the charges of misconduct that were sustained by both the master and the JTC—including that the respondent obstructed justice by fabricating evidence and twice attempting to introduce that evidence during the hearing before the master, *id*. at 365-369—we do not believe the Court's decision to remove the respondent judge hinged on her statements to this Court during oral argument.

32

Court's authority to look beyond the ambit of JTC proceedings was not deliberately examined or decided in those cases. These cases did not implicitly overrule *In re Mikesell*; if anything, they erroneously failed to follow its rule. We, therefore, disagree with the partial dissent that *In re McCree*, *In re Adams*, and *In re Ferrara* stand for the proposition that this Court possesses the constitutional authority to impose a sanction on the basis of misconduct beyond the JTC's findings of misconduct.

Another compelling reason to limit our review in JTC proceedings to allegations of misconduct found and recommended to us by the JTC is that a respondent judge is entitled to notice of the charges and a reasonable opportunity to respond to them.[65] Without such notice, it is not clear to us how a respondent judge would know which charges are at issue and, therefore, which ones he or she should substantively address when a case proceeds to our Court. Is our review limited to the charges in the formal complaint or an amended version of it?[66] Or the findings of the master? Or the findings

---

[65] See MCR 9.213 ("If an amendment [of the complaint] is made, the respondent must be given reasonable time to answer the amendment and to prepare and present a defense against the matters charged in the amendment."). See generally *In re Del Rio*, 400 Mich 665, 683; 256 NW2d 727 (1977) ("In respondent's case, the order for interim suspension was not entered until the respondent was given adequate notice and a reasonable opportunity to respond to both the complaint and the petition for interim suspension."); *In re Mikesell*, 396 Mich at 529, quoting *In re Kelly*, 238 So 2d 565, 569 (Fla, 1970) ("Under the provisions of the [Florida] Constitution this Court may exclude from the judiciary those persons whose unfitness or unsuitability bears a rational relationship to his qualifications for a judgeship, so long as the adjudication of unfitness rests on constitutionally permissible standards and emerges from a proceeding which conforms to the minimum standards of due process.").

[66] The partial dissent asserts that there is no need to amend the formal complaint to add charges based on conduct arising in the course of the JTC proceedings in light of MCR 9.209(B)(2), which provides that "[w]ilful concealment [or] misrepresentation . . . are additional grounds for disciplinary action under the complaint." See note 2 of the partial

---

33

and recommendations of the JTC?  Should a respondent and his or her attorney be put in the untenable position of having to argue against possible findings of misconduct that were not charged in the complaint or made by either the master or the JTC but might be discerned by a member of this Court?  Whatever could be said about such a regime, we would no longer say that it "provides a full panoply of procedural guarantees for adjudicating allegations of judicial misconduct."[67]

One needs look no further than this case to see the deficiencies in the partial dissent's proposed regime.  In assessing the two new allegations of misconduct "identified" by the partial dissent that do not appear in the complaint or the JTC's decision, we have no input from respondent or from the JTC on whether they agree with the partial dissent's assertion that "the master specifically concluded that respondent had lied under oath" when he denied that he interfered with the police investigation and criminal prosecution of Ms. Vargas.  For our part, we are not convinced.

At the outset, we could locate no finding in the master's report that respondent "lied under oath" as the partial dissent suggests.[68]  Instead, the penultimate sentence of

---

dissent.  As noted above, we do not reach this issue because it is not before us.  See note 20 of this opinion.  However, recognizing that JTC proceedings "are concerned not with punishing criminality but with maintaining standards of judicial fitness," *In re Mikesell*, 396 Mich at 527, we note that the partial dissent's position is a little like saying that a criminal defendant need not be charged in an information or indictment with perjury for lying at his trial for larceny because a statute on the books makes perjury a crime.

[67] *In re Del Rio*, 400 Mich at 683.

[68] The master did conclude, however, that respondent was untruthful in his correspondence with the JTC regarding his interactions with Officer Cole and the township attorney.  See note 21 of this opinion.  However, as noted above, the JTC did not adopt these findings.

the master's report provides that "Respondent made misleading statements to the Commission's investigators and to the Master when he testified to the nature of the text messages and denied interfering with the police investigation and the prosecution of Ms. Vargas." But it is far from clear that a "misleading statement" is equivalent to a "lie under oath." We have not yet addressed, for example, whether materiality or an intention to deceive are necessary to prove that a judge testified falsely under oath. Before being removed from office, a respondent judge is certainly entitled to an opportunity to provide input on these critical questions (as well as whether the specific elements are proved in a given case, if we decide they are necessary).[69] Maybe these deficiencies caused the JTC not to make findings on or recommend those charges to us. But, absent further briefing or argument, we will never know, because the part of the proceedings where the parties are able to give input has long passed.[70]

For all these reasons, we decline the partial dissent's invitation to "identify" misconduct in the record that was not charged in the complaint or found and recommended to us by the JTC.

---

[69] To the extent that the partial dissent believes that respondent should receive a more serious sanction simply because he denied the allegations of misconduct set forth in Counts 1 and 2 of the complaint, we reject such a rule because it would create immense pressure on judges to stipulate to the charges or risk removal for fighting them.

[70] We dismiss as unserious the partial dissent's extraordinary suggestion that the JTC can inoculate itself from a claim of legal error by reciting a boilerplate phrase and citing an inapplicable court rule. See note 9 of the partial dissent. It is difficult to see what value the partial dissent sees in planting this seed, which in our view can only serve as a suggestion that the JTC travel a road seemingly no justice would accept as sustainable.

## V. CONCLUSION

Respondent's judicial misconduct warrants a serious sanction to restore the public's faith and confidence in the judiciary. However, for the reasons explained above, we conclude that the recommended sanction of removal from office is disproportionate to the misconduct. We therefore modify the JTC's recommendation and order that the Honorable J. Cedric Simpson, judge of the 14A District Court, be suspended without pay from the performance of his judicial duties for a period of nine months. In addition, because respondent engaged in conduct involving "intentional misrepresentation" or "misleading statements" under MCR 9.205(B), we order him to pay costs in the amount of $7,565.54. Finally, pursuant to MCR 7.315(C)(3), the Clerk is directed to issue the order forthwith.

David F. Viviano
Bridget M. McCormack
Richard H. Bernstein
Joan L. Larsen

36

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable J. CEDRIC SIMPSON,
Judge, 14-A District Court.

No. 150404

MARKMAN, C.J. (*concurring in part and dissenting in part*).

Respondent lied under oath on at least two occasions. I respectfully believe that the majority errs by failing to give weight to this misconduct, largely because the recommendation of the Judicial Tenure Commission (JTC) to this Court did not specifically refer to the lies that nonetheless appear clearly in the record. The majority's implicit conclusion-- that this Court is constrained from holding a judge accountable in disciplinary proceedings for misconduct appearing in the record but not specifically identified in the JTC's recommendation-- is inconsistent with our caselaw. Such an understanding of the relationship between this Court and the JTC will inevitably weaken our ability to monitor, and to sanction when necessary, the professional behavior of Michigan judges. Although I agree with the majority that respondent *did* commit misconduct and therefore concur with its decision to impose *some* sanction-- indeed a considerable sanction-- I would consider additional aspects of respondent's misconduct in setting the sanction.

The irony of this dissent is that I disagree with little that is actually within the majority opinion. The majority evaluates four different allegations made against

respondent spread over three counts. I agree with most or all of the majority's factual findings regarding those allegations. First, I agree with the majority that Count 1 of the JTC complaint-- alleging that respondent interfered with Police Officer Robert Cole's investigation of respondent's intern's car accident-- has been proved. Second, I agree that Count 2-- alleging that respondent interfered with Pittsfield Township Attorney Victor Lillich's prosecution of respondent's intern-- has been proved. Third, I agree that an allegation under Count 3 of the JTC complaint-- that respondent lied about having been in contact with his intern in the early morning hours of September 8, 2013-- has not been proved and that respondent's denial was not a lie. Fourth, I agree that a separate allegation under Count 3-- that in his answer to the complaint, respondent misrepresented the reason for the thousands of text messages and phone calls he exchanged with his intern-- has been proved. Moreover, at least for the sake of argument, I also agree that the JTC has failed to prove that respondent verified his answer to the complaint, meaning that it has not been proved that his false statement in the answer was offered under oath.

Rather than what is *included* in the opinion, it is what is *excluded* that most concerns me. The majority does not recognize two additional instances of misconduct that, in my judgment, should fall within Count 3. First, the majority does not recognize that respondent's sworn explanation before Master Peter Houk for respondent's presence at his intern's car accident scene was that he wanted "to make sure that [his intern] was okay," and that he responded affirmatively when asked whether he "arrived at this location because [he] w[as] concerned for [his intern's] well-being from her ex-boyfriend[.]" This explanation was false; respondent's interaction with Officer Cole was not merely an inquiry into his intern's well-being but was instead, as the majority

2

acknowledges, "an effort to scuttle a criminal investigation of his intern." Second, the majority does not recognize that respondent's sworn explanation before the master for calling Lillich was that he

> wanted to check [his intern's] story because it didn't make much sense to [him] and that [he] thought that [his intern] had not told [him] the truth regarding [his intern's] consumption of alcohol or alcohol usage . . . that [his intern] was underestimating something to [respondent].

This explanation again was false; respondent's interaction with Lillich was, as the majority also acknowledges, an effort "to thwart the township's criminal prosecution of his intern."

In his report to the JTC, the master specifically concluded that respondent had lied under oath in offering an innocent explanation for each of these actions. According to the master, respondent's rationale for being at the accident scene was disconsonant with evidence indicating that respondent "was there to inject himself into the investigation in support of [his intern]." Therefore, the master concluded, "The allegation regarding misrepresenting the reason for [r]espondent's appearance at the accident scene has been proven by a preponderance of the evidence."[1] And concerning respondent's rationale for contacting the township attorney, the master concluded that "[r]espondent was not

[1] There can be little doubt that the master found respondent to have lied concerning his intentions for appearing at the accident scene. The master's report notes that "[p]aragraphs 68-69 of the Formal Complaint allege that the Respondent lied about his reason for appearing at the arrest scene." In the process of assessing these allegations, the master observed that respondent's stated reason for appearing at the scene was that he "was worried that the incident . . . might be related to her ex-boyfriend[.]" But, as found by the master, respondent made no inquiry at all concerning the ex-boyfriend when he injected himself at the scene.

3

truthful in his answers." To characterize a statement as a "misrepresentation" or as "not truthful" is tantamount to stating that it is a lie, and these particular lies were offered under oath. In recent cases, this Court has made it reasonably clear that a judicial officer who lies during the course of disciplinary proceedings is not competent to sit as a judge, and we have consequently removed such judges from office. See *In re Justin*, 490 Mich 394, 424; 809 NW2d 126 (2012) (noting that "some misconduct, such as lying under oath, goes to the very core of judicial duty and demonstrates the lack of character of such a person to be entrusted with judicial privilege" and that accordingly, lying under oath makes a judge unfit to continue holding judicial office) (quotation marks, citation, and emphasis omitted); see also *In re Adams*, 494 Mich 162, 186; 833 NW2d 897 (2013) ("This Court has consistently imposed the most severe sanction by removing judges for testifying falsely under oath."); *In re McCree*, 495 Mich 51, 81; 845 NW2d 458 (2014) ("Just last term, this Court held [in *Adams*] that lying under oath ' "is entirely incompatible with judicial office and warrants removal." ' ") (citations omitted).

However, what is more troubling than the lack of consideration of these two instances of misconduct is the majority's legal *rationale* for doing so. Why are the master's allegations of false testimony given under oath going unaddressed? While the majority never directly explains this, its position appears to be predicated on the fact that these two instances of misconduct are not specifically discussed in the JTC's recommendation to this Court. Rather, the JTC's recommendation as to Count 3 only pertains to the two allegations of lying or misrepresentation that the opinion does discuss-- the allegation that respondent lied about being in contact with his intern in the early morning hours of September 8, 2013, and the allegation that he lied in his answer to the

4

complaint. The JTC's recommendation does not address the master's finding that respondent lied under oath when he denied that he was interfering with either Cole's investigation or Lillich's prosecution; it simply does not discuss these allegations at all.

The majority never squarely asserts that this Court cannot hold a respondent responsible for misconduct contained in the record but not specifically identified as a basis for discipline in the JTC's recommendation. Instead, it strongly implies this by failing to acknowledge these instances of sworn lying identified by the master; it would be one thing after review to reject these instances of misconduct as a basis for sanctions, but it is a considerably different thing to fail entirely to even consider these instances of misconduct. The only support offered for this lack of acknowledgment in the majority's analysis is the assertion that "we have long held that our focus in judicial disciplinary proceedings is on the JTC's findings," with a footnote discussing *In re Mikesell*, 396 Mich 517; 243 NW2d 86 (1976), and *In re Chrzanowski*, 465 Mich 468; 636 NW2d 758 (2001).[2] The apparent upshot is that misconduct set forth in the *record* but not

---

[2] Moreover, the majority reads *Mikesell* significantly more broadly than is warranted. In *Mikesell*, 396 Mich at 524-526, the original complaint contained 12 allegations of misconduct, 6 of which were rejected by both the master and the JTC and were not considered by this Court. Here, by contrast, we are debating instances of misconduct that *were*, in fact, recognized by the master, some of which were adopted by the JTC (including respondent's stated purpose for thousands of text messages with his intern from August to November of 2013), and others of which were *not* recognized by the master and only consist of further *examples* of the misconduct that respondent *is* charged with by the JTC in Count 3. The only question is whether this Court can *bolster* its conclusions in regard to one or more lies found by the JTC with *additional* lies not reflected in the JTC's findings, which we have clearly and regularly done since *Mikesell*. Application of *Mikesell* to misrepresentations made during JTC proceedings is particularly inappropriate because willful concealment and misrepresentation during JTC proceedings *always* constitute an additional basis for disciplinary action once a complaint has been filed without the need for an amended complaint to set forth any additional

5

specifically identified as misconduct in the JTC's *recommendation* cannot constitute a basis for this Court to impose judicial discipline.

This reading of our authority in judicial disciplinary proceedings is a misreading of the law. Our court rules specifically provide that "[w]ilful concealment [or] misrepresentation . . . are additional grounds for disciplinary action under the complaint" in a JTC matter. MCR 9.209(B)(2). Respondents are consequently on notice that telling the truth in JTC proceedings is *always* imperative and that this Court "review[s] the record *de novo* in this type of action." *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971). Moreover, after reviewing de novo the record of JTC proceedings, this Court has repeatedly imposed discipline on the basis of misconduct beyond that set forth in the JTC's recommendation. Thus, in *In re Ferrara*, 458 Mich 350, 363-364 & n 13; 582 NW2d 817 (1998), we pointed to the respondent's evasive and dishonest remarks made to this Court during oral argument as part of a pattern of "unsupportable denials and inconsistent statements to the media, the public, the commission, and this Court," indicating her "refus[al] to accept responsibility for her [racist] comments" and constituting "clear evidence of her inability to be forthright, to avoid appearances of

_____

allegations about misrepresentations during the pendency of JTC proceedings. See MCR 9.209(B)(2). The majority also errs by giving meaning to the Court's remark in *Chrzanowski*, 465 Mich at 481, that "it is the JTC's, not the master's conclusions and recommendations[,] that are ultimately subject to review by this Court." That statement was made in response to the respondent's argument that the JTC had not sufficiently *deferred* to the master's findings. *Id*. at 480. It does not stand for the proposition that this Court may not review de novo the record and identify additional instances of misconduct, if any, beyond those set forth in the JTC's recommendation. See *In re Somers*, 384 Mich 320, 323; 182 NW2d 341 (1971) (recognizing that this Court conducts a review de novo of the record in judicial disciplinary proceedings).

impropriety, and to fulfill the ethical obligations of a judicial officer." Obviously, remarks made by the respondent during oral argument *before this Court* could never constitute a part of the recommendation made by the JTC *to* this Court, which prompted our consideration of the matter in the first place. Similarly, in *Adams*, 494 Mich at 177, "we f[ound] that respondent also testified falsely about several other matters," a finding we made "[i]n addition to the factual misrepresentations identified by the JTC." Again, in *McCree*, 495 Mich at 70, we did the same when we discerned several lies "[i]n addition to the factual findings that we adopt[ed] from the JTC . . . ." It is clear from *Ferrara*, *Adams*, and *McCree* that there is no requirement that this Court avert its gaze from on-the-record judicial misconduct even if the JTC has not connected the dots for us, or has lacked the opportunity to connect the dots, in the exacting manner required by the majority.[3] The appropriate sanction, as well as the fitness of a respondent to sit as a

---

[3] See also *In re Morrow*, 496 Mich 291; 854 NW2d 89 (2014); *In re Hathaway*, 464 Mich 672; 630 NW2d 850 (2001). In *Morrow*, 496 Mich at 297, "the master concluded that the facts constituted judicial misconduct in only two counts," while "[a] majority of the JTC disagreed in large part . . . ." However, "[t]he JTC made no mention of two of the alleged instances of misconduct, . . . evidently agreeing [with the master] that these counts did not establish judicial misconduct." *Id*. at 297 n 3. We stated that "[o]ur review of the record . . . le[d] us to the same conclusion," *id*., suggesting that we had independently reviewed the master's report in reaching our own conclusion regarding whether the JTC's recommendation identified all the misconduct that it should have identified. In *Hathaway*, 464 Mich at 682, the JTC recommended to this Court that we suspend the respondent for 30 days on the basis of the misconduct the JTC identified. We modified that suspension under MCR 9.225 to a six-month suspension. *Id*. at 692. The majority opinion argues that *Ferrara*, *Adams*, and *McCree* "erroneously failed to follow [*Mikesell*'s] rule." But it is noteworthy that this Court specifically cited *Mikesell* in both *McCree* and *Adams*, obviously discerning no apparent conflict between *Mikesell* and the decision made in both *McCree* and *Adams* to recognize misconduct contained in the record even when it was not included in the JTC's recommendation. Moreover, the only instances in which *Mikesell* has been affirmatively cited for the proposition asserted by

7

judge, are unaffected by whether a respondent's misconduct has been identified by the JTC[4] or discerned from the record by this Court.

The majority's understanding would significantly cabin this Court's ability to identify misconduct on the part of Michigan judges and is neither good law nor good disciplinary policy. "[T]*he purpose of judicial discipline is not to punish but to maintain the integrity of the judicial process*." *In re Moore*, 464 Mich 98, 118; 626 NW2d 374 (2001) (emphasis added). The ultimate responsibility to uphold the integrity and the professional standards of the Michigan judiciary rests with this Court under our Constitution:

---

the majority were in *dissents*. Thus, we reached our conclusion in *Hathaway* over a dissent that expressly argued that under *Mikesell* "matters beyond the JTC's recommendation are not to be considered by th[is] Court." *Id*. at 701 (CAVANAGH, J., dissenting). See also *In re Brown (After Remand)*, 464 Mich 135, 144; 626 NW2d 403 (2001) (CORRIGAN, J., dissenting) (relying on *Mikesell* to distinguish between conduct that was included in the complaint but not contained in the JTC's recommendation and conduct that was included in the complaint *and* in the JTC's recommendation). Whether the majority misreads *Mikesell*-- as I believe it does-- or *Mikesell* has been overruled by implication, see *People v Ream*, 481 Mich 223, 232; 750 NW2d 536 (2008), one thing seems certain-- our law *today* is clearly reflected in *Ferrara*, *Adams*, and *McCree*. See also Garner et al, The Law of Judicial Precedent (2016), p 300 ("A court of last resort generally follows its decision in the most recent case, which must have tacitly overruled any truly inconsistent holding.").

[4] The majority asserts that it is in accord with the JTC in that the first *Brown* factor-- "misconduct that is part of a pattern or practice"-- is not satisfied because in the words of the JTC, "[t]here was no evidence . . . that [r]espondent repeated similar misconduct in other cases." However, we have already held in *Adams*, 494 Mich at 180-181, that repeated instances of lying *within* the course of a single JTC proceeding are fully sufficient to support an enhanced sanction under that factor. This is but one good illustration of why this Court has not viewed itself as bound by the JTC's recommendations.

On recommendation of the judicial tenure commission,[5] the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. [Const 1963, art 6, § 30(2).]

Judicial discipline cases are therefore unique. Ordinarily, we sit as an appellate court, reviewing how lower courts have disposed of parties' disputes. Even when our original jurisdiction is invoked, we are generally adjudicating a dispute between parties. Judicial discipline cases, by contrast, reflect an exercise of this Court's *affirmative duty* to maintain the integrity of the judiciary. "[T]his Court, and this Court alone, decides what, if any, disciplinary action shall be taken against any elected member of the state

---

[5] In *Hathaway*, 464 Mich at 695, we held that "the phrase 'on recommendation' is an expression [of] how the judicial discipline process is *initiated*." This phrase-- which was also what the Court relied on in *Mikesell*-- means, as set forth in *Hathaway*, only that this Court cannot take action sua sponte against a judge; disciplinary action must invariably be commenced by the JTC. However, "[o]nce the JTC makes a recommendation of discipline, this Court may accept or reject that recommendation." *Id*. "Inherent in our authority to reject a JTC recommendation is the option to decide the appropriate discipline to impose, whether it be an affirmance, a reduction, or an increase in the recommendation of the JTC." *Id*. The same reasoning applies to our ability to identify misconduct beyond that set forth in the JTC's recommendation, reasoning that is incompatible with the majority's assertion that *its* interpretation of *Mikesell* "was actually imposed by the people of our state when they voted to" create the JTC in 1968. Once the judicial disciplinary process has been *initiated*, this Court reviews the record de novo in accordance with *Somers*, and we possess inherent authority to identify misconduct contained in the record and to impose an appropriate sanction. As for the several cases cited by the majority in note 62 as additional support for its reading of *Mikesell* and *Chrzanowski*, I read these as being fully consistent with *Hathaway*-- JTC disciplinary recommendations must precede the imposition of sanctions by this Court. However, the JTC's recommendations do not detract from our prerogative, set forth in *Ferrara*, *Hathaway*, *Adams*, and *McCree*, to go *beyond* such recommendations once the process has been initiated.

judiciary[.]" *In re Del Rio*, 400 Mich 665, 689; 256 NW2d 727 (1977). It is inconsistent with our precedent-- and it is dubious public policy-- to constrain this Court's ability to discipline misbehaving judges. I would not self-impose such a limitation on our ability "to protect the people from corruption and abuse on the part of those who wield judicial power" in this fashion. *In re Jenkins*, 437 Mich 15, 28; 465 NW2d 317 (1991).

Indeed, the fact that this Court is charged with the affirmative obligation to guard against judicial misconduct also leaves me indifferent to whether respondent's answer in this matter was or was not "verified." The majority concludes that respondent's "false statement . . . was given in the answer to the complaint" but that "the JTC has not proved [the answer] was verified . . . ." As a result, the majority holds that because it "cannot conclude that the false statement in the answer was given under oath," the most severe sanction of removal is not warranted. But given that the majority concedes that respondent made a "false statement" in his answer, I do not see why we should be concerned about whether the false answer was proved to be sworn. The JTC is the constitutional agency by which this Court investigates judicial misconduct, and I do not understand why a respondent who intentionally frustrates our efforts at discovering the truth of misbehavior should face lesser consequences for lying to the JTC if his response to our inquiries was not sworn. Once again, these misstatements were made to this Court's investigative arm *in the course of* its investigation of respondent's alleged misconduct.[6] The distinction resting upon whether a person's responses were sworn is

---

[6] The examples offered by the majority justifying a lesser sanction for lies not under oath are easily distinguishable. In *In re Lawrence*, 417 Mich 248; 335 NW2d 456 (1983), the misrepresentation was contained in a letter sent some years earlier to a county concealed

10

critical to determining whether that person is *criminally* liable for his or her lies, but the distinction is not critical with regard to judicial disciplinary proceedings.

The majority treats JTC proceedings as tantamount to ordinary adversarial litigation. For example, it appears to fault the JTC examiner for failing to file an amended complaint to include allegations of misconduct occurring during the proceedings before the master, although the majority ultimately avoids reliance on this issue, "because respondent has not challenged the JTC's findings on this basis . . . ." Perhaps, however, respondent has not undertaken such a challenge because it is not relevant in light of MCR 9.209(B)(2), which makes clear that lies and misrepresentations always provide an additional basis for discipline beyond what is alleged in the complaint itself.[7] "Judicial disciplinary proceedings . . . are fundamentally distinct from all other

---

weapon licensing board, not to the JTC. In *In re Binkowski*, 420 Mich 97; 359 NW2d 519 (1984), the judge lied to his *colleagues* about a JTC investigation that he faced. And in *In re Milhouse*, 461 Mich 1279 (2000), and *In re Radzibon*, 457 Mich 1201 (1998), the respondent judges ultimately *admitted* to their lies, unlike respondent here. None of these cases comports with the facts in this case-- in this case, the respondent has persisted in a lie made to this Court's investigative arm.

[7] The majority states that reliance on this court rule is "like saying that a criminal defendant need not be charged in an information or indictment with perjury for lying at his trial for larceny because a statute on the books makes perjury a crime." First, this reflects the majority's misplaced analogy to criminal proceedings. Second, it essentially renders this portion of MCR 9.209(B)(2) nugatory. The rule requires that a respondent file an answer including "a full and fair disclosure of all facts and circumstances pertaining to the allegations regarding the respondent," and it places the respondent on notice that lies in that answer constitute an additional basis for discipline beyond the contents of the complaint. Unlike a statute establishing a substantive criminal offense such as perjury, MCR 9.209(B)(2) does not propound that lying is a disciplinable offense-- a proposition effected by MRPC 3.3(a)(1) and MCR 9.205(B)(2)-- but rather places a respondent on notice that lies contained in his or her answer, but not charged in the complaint, constitute a potential basis for additional discipline.

11

legal proceedings, whether civil or criminal." *Jenkins*, 437 Mich at 28. In ordinary civil or criminal proceedings, some compromise of the truth-seeking function of the judicial process is necessarily tolerated in exchange for furthering other important constitutional and societal values. Those concerns are of significantly lesser weight in the context of judicial disciplinary proceedings because it is the "integrity" of the judicial process that is paramount, and that integrity is maintained by appropriately disciplining judges who lie or misrepresent the facts. We have, for example, signaled that the "exclusionary rule" may not apply in judicial disciplinary proceedings. See *id*. ("[T]he unique character and purpose of judicial disciplinary proceedings might incline us not to apply the exclusionary rule . . . ."); see also *In re Servaas*, 484 Mich 634, 677; 774 NW2d 46 (2009) (MARKMAN, J., dissenting) ("This Court cannot, as a function of the examiner's behavior, avoid its responsibility to address respondent's misconduct."). We have also identified as an aggravating factor in judicial disciplinary proceedings "misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy . . . ." *In re Brown*, 461 Mich 1291, 1293 (2000). In the end, the paramount concern in a judicial disciplinary proceeding pertains to whether and when an individual is fit to hold judicial office and to exercise the judicial power.

Further, our court rules themselves support the notion that judicial discipline is not on par with ordinary adversarial criminal litigation. MCR 9.203(D) provides that "[a]n investigation or proceeding under this subchapter may not be held invalid by reason of a non-prejudicial irregularity or for an error not resulting in a miscarriage of justice." In failing to accord consideration to respondent's false statements in his answer to the complaint, the majority essentially renders that portion of the disciplinary proceedings

12

invalid by reason of a procedural error. The majority identifies no prejudice that respondent would suffer if he were to be held accountable for the false statements he provided in the answer to the complaint, whether or not the JTC has shown that his answer was verified. Holding respondent accountable for his false statements would hardly seem to result in any articulable "miscarriage of justice." Indeed, such a miscarriage results, in my judgment, only from *failing* to hold respondent responsible for false statements made in the course of a JTC investigation. The majority fails to show how verification is related in any way to the ends served by the judicial disciplinary process, in particular, the preservation of the integrity and reputation of our state's judiciary.

The majority similarly has not shown that prejudice or any miscarriage of justice would result if this Court were to recognize misconduct committed by the respondent that was identified by the master but neither specifically adopted nor rejected by the JTC.[8] Respondent knew that he was obliged to tell the truth in these proceedings, and he knew on the strength of *Ferrara*, *Adams*, and *McCree* that if we did not give credence to his explanation for his behavior, he could be disciplined for his false explanations. Therefore, respondent would not be unfairly surprised if we were to conclude that the

---

[8] If the concern of the majority is with the respondent's being afforded "an opportunity to provide input" regarding areas of concern that appear to trouble the majority based on its handling of the JTC recommendation, why does the majority not simply remand to the JTC under MCR 9.225 so that the JTC might specifically evaluate each of the master's findings, as we did on strikingly similar facts in *In re Logan*, 779 NW2d 249 (Mich, 2010)? See also *In re Brown*, 461 Mich 1209 (1999); *In re Brown*, 461 Mich 1291 (2000); *In re Hathaway*, 461 Mich 1296 (2000); *In re Chmura*, 461 Mich 517; 608 NW2d 31 (2000).

13

record contained a preponderance of evidence that he had lied under oath. It is entirely "practicable and fair" to hold respondent accountable for his lies. MCR 9.200. I do not see how it is inconsistent with "the rights of the judges who are governed by these rules," *id.*, to take notice of respondent's on-the-record lies when he was well aware that it is this Court's longstanding practice to do so. The majority inadvertently erects a new and unnecessary obstacle to "preserv[ing] the integrity of the judicial system," "enhanc[ing] public confidence in that system," and "protect[ing] the public [and] the courts . . . ." *Id.* Nor do I share the majority's concern about "creat[ing] immense pressure on judges to stipulate to the charges," because all that a respondent need do is tell the truth as a continuing condition of being "entrusted with [the] judicial privilege," *Justin*, 490 Mich at 424 (quotation marks and citation omitted).[9]

In sum, I have two areas of disagreement with the majority, both of which concern this Court's role in the judicial disciplinary process. First, I disagree with the majority's implication that this Court cannot consider evidence of misconduct derived from the record but not specifically alleged as misconduct in the JTC's recommendation to this

---

[9] While I would hardly urge such a course of action, if the majority's paramount concern is merely to ensure that allegations of misconduct are formally contained in the JTC's recommendation to this Court, what would stop the JTC from effectively insulating its recommendations from claims of error by simply incorporating by reference the record developed by the master, any alternative findings and conclusions on which the master relied, or both? On what basis would a simple statement to that effect fail to satisfy the majority? That something this peremptory and insubstantial could insulate the JTC's recommendations from being faulted under the majority's analysis only illustrates how fundamentally harmless the JTC's purported "defects" are in the instant case and consequently how markedly the majority misapprehends MCR 9.203(D). It is difficult to understand how the JTC's omission of something this insubstantial could constitute a "miscarriage of justice" under the court rule.

14

Court.[10]  Second, I disagree with the majority's assertion that when a respondent has indisputably lied in his or her answer to a complaint, the JTC's failure to prove that the respondent's answer was verified justifies a lesser sanction than if the answer had been verified.  As applied to the instant case, I would first recognize and assess respondent's on-the-record lies in his sworn testimony before the master when he denied intending to interfere with the police investigation or subsequent prosecution of his intern.  I would then treat the lie in respondent's answer-- a lie that this Court unanimously recognizes-- without regard to whether it was verified.  Regardless of this, respondent's lie constituted an effort at frustrating this Court in carrying out its constitutional duty to uphold the integrity and reputation of the judiciary.  I would impose a sanction that takes all of respondent's lies into account in determining an appropriate sanction.  Accordingly, I respectfully dissent.

Stephen J. Markman
Brian K. Zahra

WILDER, J., took no part in the decision of this case.

---

[10] I also note that MCR 9.205(B) enables this Court to order a respondent "to pay the costs, fees, and expenses incurred by the commission in prosecuting the complaint only if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation, or if the judge made misleading statements to the commission, the commission's investigators, the master, or the Supreme Court."  Limiting our ability to take notice of lies and other misrepresentations also unnecessarily circumscribes our ability to recoup costs where costs would otherwise constitute part of an appropriate remedy.

15